**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

CASE NO.: 08-1532 (CKK)

_____

1443 CHAPIN STREET, LP,

          Plaintiff,

    V.

PNC BANK, NATIONAL ASSOCIATION,

          Defendant.

_____

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

_____

G. David Fensterheim, Esq., Bar # 358223
FENSTERHEIM & BEAN, P.C.
1250 Connecticut Ave., NW, Suite 700
Washington, D.C.  20036
(202) 419-1510
Fax: (202) 842-2869
david@fensterheimandbean.com

*Counsel for Plaintiff, 1443 Chapin Street, LP*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................................iv

INTRODUCTION ...........................................................................................................1

I.    DEFENDANT MISCHARACTERIZES THE NATURE OF THIS DISPUTE AND OBSCURES THE EXISTENCE OF THE MANY MATERIAL FACTS IN DISPUTE.............................................................................................................2

A.    Virtually Every Supposedly Undisputed Material Fact Listed By The Defendant In Its Statement Is In Fact Hotly Disputed As Demonstrated By The Affidavit And Exhibits Attached Hereto..............................................................................................................2

B.    In Addition To The Material Facts In Dispute (From Among Those Defendant Claims Are Undisputed), There Are Also Many Additional Material Facts That Were Simply Ignored By Defendant But Must Be Resolved For A Proper Disposition Of The Merits Of This Case.........................................................................................................8

II.    CHAPIN GAVE A PROPER AND EFFECTIVE NOTICE OF EXTENSION AND WAS NOT IN DEFAULT AT THE TIME......................................................................11

A.    PNC'S "Wrong Address" Argument Is Based On A Hypertechnical And Illogical Reading Of Its Own Out Of Context Paraphrase Of The Agreement.  In Fact, Chapin Street Complied With Both The Letter And The Spirit Of The Actual Language Of The Agreement .................................................................................................................12

B.    Contrary To PNC'S Argument, The Loan Documents Do Not Permit A Secret Default Without Any Notice Or Opportunity To Cure ......................................................16

1.    When no specified time for notice or cure is provided, the law assumes a notice and cure period that is reasonable under the circumstances. A *fortiori*, when, as in this case, the parties have specifically negotiated for the inclusion of the words "reasonable" and "good faith" in a default provision, a reasonable notice and cure period is required. 16

2.    Insecurity clauses must be scrutinized carefully to ensure that they are not utilized as a sword to gain an unfair commercial advantage....................................................22

III.    SPECIFIC PERFORMANCE IS AN AVAILABLE REMEDY WHICH MAY VERY WELL BE APPROPRIATE IN THIS CASE BASED ON THE SOUND DISCRETION OF THE COURT. HOWEVER, THIS COURT NEED NOT REACH THE ISSUE OF REMEDY AT THIS TIME SINCE PNC CONCEDES THAT DAMAGES ARE AN APPROPRIATE REMEDY AND PLAINTIFF IS SEEKING DAMAGES .................................................................................................................24

A.    Specific Performance Is Widely Recognized As An Available Remedy For Breach Or Repudiation Of A Construction Loan In Cases Such As This ....................................25

B.    PNC's Claim That Granting Specific Performance Would Present Insurmountable Difficulties of Supervision Is Greatly Exaggerated ..........................................................31

IV.    PNC'S WRONGFUL REPUDIATION OF THEIR OBLIGATIONS UNDER THE LOAN EXCUSED FURTHER PERFORMANCE BY BORROWER AS A MATTER OF LAW PENDING RECEIPT BY BORROWER OF SATISFACTORY ASSURANCE OF COMPLIANCE BY PNC........................................................................................32

A.    The Insistence By One Party Upon Terms Not Contained In A Contract Constitutes An Anticipatory Repudiation ..........................................................................................33

B.    Repudiation Excuses Further Performance Until And Unless Adequately Retracted, Even If The Non-Breaching Party Continues To Urge Performance..................................35

V.    PNC'S ARGUMENT THAT CHAPIN SHOULD HAVE SOUGHT A SECOND SIX MONTH EXTENSION EVEN AFTER PNC HAD UNEQUIVOCALLY REPUDIATED ITS OBLIGATION WITH RESPECT TO THE FIRST SIX MONTH EXTENSION, AND WHILE THE PARTIES WERE ALREADY ENGAGED IN LITIGATION, IS FRIVOLOUS ....................................................................................36

VI.    IF THE COURT IS NOT PREPARED TO DENY DEFENDANT'S MOTION BASED ON THIS OPPOSITION, PLAINTIFF SHOULD BE AFFORDED A REASONABLE OPPORTUNITY TO PRESENT ADDITIONAL MATERIAL AND AFFIDAVITS PERTINENT TO THE MOTION...........................................................36

CONCLUSION ......................................................................................................40

## TABLE OF AUTHORITIES

**Judicial Opinions**

8621 Ltd P'ship v. LDG, 900 A.2d 259 (Md. Ct. Spec. App. 2006) ……………………………26
America Bank v. Waco Airmotive, 818 S.W.2d 163 (Tex. 1991) …………………………………22
Ammerman v. City Stores, 266 F. Supp 766, 776 (D.D.C. 1967), affd, 394 F.2d 950 (D.C. Cir.
1968)……………………………………………………………………..………….27, 32
Anderson Excavating & Wrecking Co. v. Sanitary Imp. Dist. No. 177, 654 N.W.2d 376 (Neb.
2002) ………………………………………………………………………………….34
Archway Motors, Inc. v. Herman, 378 A.2d 720 (Md. Ct. Spec App. 1977)……25, 30, 31, 32, 33
Blades v. White Motor Credit Corp., 750 P.2d 1198 (Or. Ct. App. 1988)………………………22
Brown v. Avemco, 603 F.2d 1367 (9th Cir.1979) …………………………………………………23
Camden v. South Jersey Port Com., 73 A.2d 55 (N.J. Super. Ct. Ch. Div. 1950) …………….....28
Cattail Assoc. Inc. v. Sass, 907 A.2d 828 (Md. 2006) ……………………………………….…25
Chirella v. Erwin, 270 Md. 178, 310 A.2d 555 (Md. 1973)……………………………………..15
C-K Enterprises Inc. v. Depositors Trust Co., 438 A.2d 262 (Me. 1981) ………………………22
Clay v. Faison, 583 A.2d 1388 (D.C. 1990) ………………………………………………………26
Components Direct v. European American Bank, 572 N.Y.S.2d 359 (N.Y. App. 1991)….....…..22
Conrad Brothers v. John Deere Ins. Co., 2001 WL 1615459 (Iowa, 2001)……………………..34
Country Club Associates Ltd. Partnership v. F.D.I.C., 918 F.Supp. 429 (D.D.C. 1996)……17, 24
Drazin v. American Oil Co., 395 A.2d  32 (D.C. App. 1978) …………………………………..17
Easton Theatres, Inc. v. Wells Fargo Land and Mortg. Co., Inc., 401 A.2d 1333 (Pa. Super. Ct.
1979). ………………………………………………………………………………….....30
First Nat'l State Bank v. Commonwealth Federal Sav. & Loan Assoc., 610 F.2d 164 (3rd Cir.
1979)…………………………………………………………………………………..29
Flack v. Laster, 417 A.2d 393 (D.C. 1980) ………………………………………………….17, 26
Independence Management v. Anderson & Summers, 874 A.2d 862 (D.C. 2005) …17, 26, 30, 36
J.R. Hale Contracting Co., Inc. v. United New Mexico Bank at Albuquerque, 799 P.2d 581
(N.M. 1990) ……………………………………………………………………….…23
Jacobson v. First Nat'l Bank of Bloomingdale, 20 A.2d 19 (N.J. Ch. 1941)……………………28
Kammert Brothers Enterprises, Inc. v. Tanque Verde Plaza Co., 428 P.2d 678 (Ariz. 1967)…..35
KMC Co. v. Irving Trust Co., 757 F.2d 752 (6th Cir. 1985). ……………………………………..22
Maryland City Realty v. Vogts, 238 Md. 290, 208 A.2d 701 (Md. 1965)………………..….…30
McErlean v. Union Nat'l Bank, 414 N.E.2d 128 (Ill. App. Ct. 1980)…………………………...29
McKeever v. Realty Corp., 37 A.2d 305 (Md. 1944) …………………………………………...31
 Menako v. Kassien, 61 N.W.2d 332 (Wis. 1953). ……………………………………………...35
National Housing Partnership v. Municipal Capital Appreciation Partners I, L.P., 935 A.2d 300
(D.C. 2007)………………………………………………………………………….…..38
Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co., 508 F.2d 283 (7th Cir.1974)…………...…35
Quality Lighting v. Benjamin, N.E.2d 377 (Ill.App. 1992)………………………………………38
R.W. Power Partners, L.P. v. Virginia Elec. and Power Co., 899 F.Supp. 1490, 1495 (E.D. Va.
1995)……………………………………………………………………………….……18
REA Express, Inc. v. Interway Corp., 538 F.2d 953, 955 (2d Cir.1976)………………………..34
Reid v. Key Bank of Southern Maine Inc., 821 F.2d 9 (1st Cir. 1987)……………………..……22
Selective Builders, Inc. v Hudson City Sav. Bank, 349 A.2d 564 (NJ Super 1975)………....27, 29

Southampton Wholesale Food Terminal, Inc. v. Providence Warehouse Co., 129 F.Supp 663 (D. Mass. 1955)…………………………………………………………………………………………28
Spencer Companies, Inc.  v. Chase Manhattan Bank, N.A., 81 B. R. 194 (D. Mass 1987)……..22
Tauber v. Quan, 938 A.2d 724 (D.C. 2007)……………………………………………..……26
United California Bank v. Prudential Ins. Co. of America,  140 Ariz. 238, 681 P.2d 390 (Ariz. Ct. App. 1983)…………………………………………………………………………..29, 33
WRH Mortg., Inc. v. S.A.S. Associates, 214 F.3d 528 (4th Cir. 2000)………………………….34
Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003)………………………...…..1

**Statutes**
Fed.R.Civ.P. 12(d)……………………………………………………….………………………1, 39
Fed.R.Civ.P. 56(f)…………………………………………………………………………………..39

**Secondary Sources**
"Specific Performance of Agreement to Lend or Borrow Money"  82 ALR3d 1116………..…27
17A Am Jur, 2d Contracts § 688……………………………………………………………...…33
5A Corbin, Contracts §1222 (1964)…………………………………………………........ 34, 35
Bruner and O'Connor on Construction Law § 18:15………………………………………...…17
Restatement (Second) of Contracts (1981)………………………………….…..17, 32, 34, 35, 36
Williston on Contracts § 39…………………………………………………………............34, 36

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **1443 CHAPIN STREET, LP** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-1532 |
| | ) | Judge Kollar-Kotelly |
| | ) | |
| **PNC BANK, NATIONAL ASSOCIATION** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF, 1443 CHAPIN STREET, LP'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff, 1443 Chapin Street, LP ("Chapin" or "Borrower"), by its undersigned counsel, hereby respectfully submits this Memorandum in Opposition to PNC Bank's ("PNC" or "Bank") Motion to Dismiss[1] or for Summary Judgment.  In support of this Opposition, Plaintiff also submits the accompanying Affidavit of Steven Schwat, with accompanying Exhibits.  As demonstrated by this Opposition, there are a great number of material facts in dispute in this matter.  These facts must be resolved by a fact-finder before there can be a final determination of this controversy.  Accordingly, this matter is not appropriate for resolution on a motion for summary judgment and Defendant's motion should be denied.

---

[1] Although styled as a 12(b)(6) "motion to dismiss for failure to state a claim" (as well as a motion for summary judgment), the 12(b)(6) aspect is "in name only."  Substantively, the motion is just a motion for summary judgment. Except in the title, one searches in vain for any analysis, discussion or even mention of the supposed grounds for a "motion to dismiss."   Since all of Defendant's arguments depend heavily on its version of the facts which directly contradict the allegations of the Complaint, and also rely heavily on matters outside of the pleadings, Defendant must have known that this Court's consideration of its motion would be as a motion for summary judgment. See Fed.R.Civ.P. 12(d); see also Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003) (noting that when a judge considers matters outside the pleadings, a motion to dismiss under Rule 12(b)(6)  must be converted into a Motion for Summary Judgment under Rule 56).

**I.    DEFENDANT MISCHARACTERIZES THE NATURE OF THIS DISPUTE AND OBSCURES THE EXISTENCE OF THE MANY MATERIAL FACTS IN DISPUTE**

The credibility of Defendant's Motion is suspect from its opening paragraph. According to Defendant's characterization of Plaintiff's Complaint, this is a "suit for specific performance of a matured construction loan . . . that is in default." Of course this is not true. Rather, this is a suit for <u>damages</u> (and specific performance) as a result of the willful breach and repudiation by PNC of its obligations under an <u>unmatured</u> construction loan, which was <u>not in default</u> but rather was current, fully performing and in full compliance with all loan terms. While Defendant's characterization of the case may represent its version of the facts, it certainly doesn't represent a proper characterization of Plaintiff's suit.

**A.    Virtually Every Supposedly Undisputed Material Fact Listed By The Defendant In Its Statement Is In Fact Hotly Disputed As Demonstrated By The Affidavit And Exhibits Attached Hereto**

Defendant lists 61 separate facts in its "Statement of Material facts As To Which No Genuine Dispute Exists." Approximately half of these facts are background facts such as the names of the parties, the address of the property, the identification of the loan documents, the amount of the loan and the advances to date. Every single one of the remaining facts listed by Plaintiff are either in dispute or have been seriously distorted. Indeed the parties' disputes with regard to these facts are not only genuine, but even without the benefit of discovery, Plaintiff presents in this Opposition (and the attached Affidavit and Exhibits) credible and persuasive evidence of its version of those facts. Plaintiff respectfully suggests that once it is able to complete discovery in this case, it will be able to present a compelling case to the trier of fact that Plaintiff's version of this case is the more accurate one. A few examples of the disputed

nature of the material facts in this case (that PNC claims in its Memorandum are undisputed) should suffice at this point.

First, contrary to PNC's assertion, Plaintiff did in fact give proper and timely notice of the extension of the loan, to a proper person, at the proper address. See Affidavit at ¶¶ 47-48, 60. Chapin confirmed that the notice was actually and timely received by PNC (although this fact is conveniently ignored in PNC's memorandum). See Affidavit at ¶ 47. Perhaps this explains why despite two separate and written allegation of default, and repeated discussions with PNC prior to filing of the lawsuit, no one at PNC ever mentioned that Plaintiff's notice was supposedly sent to the wrong address. Defendant's motion was the first time Plaintiff ever heard of this argument. See Affidavit at ¶ 60.

Second, contrary to PNC's assertion, the loan documents do not require the construction of an 18 unit building. PNC's assertion is contradicted by the commitment letter, which indicates a 15 (not 18) unit building as the basis for the loan commitment, and by the construction loan agreement itself (which also lists a 15 unit building). It is also contradicted by clear evidence which demonstrates that the bank was aware of and approved the plans for the construction of the very 16 unit project for which it knowingly provided almost $3.7 million in funding after reviewing over 16 separate draw requests, including 11 of which were approved after being sent the updated plans in October 2006 clearly showing 16 units and 12 parking spaces. See Affidavit at ¶ 16. Perhaps this explains why, despite two separate written allegations of default and repeated discussions with PNC prior to the filing of this lawsuit, no one at PNC ever mentioned this supposed fact. See Affidavit at ¶ 16. Defendant's motion was the first time Plaintiff ever heard of this creative argument.

3

Third, contrary to PNC's assertion, their supposed determination of a non-monetary default was clearly not made in "good faith."  Indeed, the basis for this determination was kept secret from Plaintiff until the filing of PNC's summary judgment motion.  Now that the supposed basis of that determination has been described, it is clear that there is strong circumstantial evidence (even without the benefit of discovery which Plaintiff believes will uncover direct evidence of the lack of good faith) that the determination was not made "honestly,"  a common formulation of the good faith standard. Indeed, although PNC relies on the Riley appraisal, it is now clear that the Riley appraisal was merely a pretext, or an after the fact justification, for a decision that had already been made.  PNC did not even receive that appraisal until January 16, 2008.  By this time, PNC had already decided it no longer wanted to make condo construction loans in the District of Columbia and had already repudiated its obligation to extend the Chapin loan. See Affidavit at ¶ 6.

Moreover, PNC's appraiser assured Plaintiff that he would allow him to review a draft of the appraisal before it was finalized, a reasonable practice to avoid clear errors. See Affidavit at ¶ 11. However, not only did the appraiser fail to do this (presumably at the instruction of PNC), but PNC refused to allow Plaintiff to see the completed appraisal or even to obtain any information about its conclusions, despite repeated requests.  Affidavit at ¶¶ 11-12, 53.  PNC never provided any explanation for why it would not allow Plaintiff to review the appraisal on which it was supposedly relying to make such a momentous decision with regard to this loan - - i.e. to stop funding in the midst of construction.  Affidavit at ¶ 12. Now that the appraisal can be reviewed, the reason for PNC's secrecy becomes clear.  The appraisal is so fundamentally flawed and error ridden that it could not possibly be relied upon to make a good faith determination of

4

impairment.  Since the purpose of the appraisal was for pretext and not an honest determination, it is obvious why PNC did not want, or need, to be confronted with these errors at the time.

Fourth, contrary to PNC's assertion that this was a troubled project, PNC was well aware that the project was on track to be completed on time and that PNC's prospect of repayment was not at all impaired.  See Affidavit at ¶ 62. PNC conveniently ignores the fact that the loan was always budgeted to run out of interest reserve about a year before the end of the extended loan term and that interest during the last year of the loan was always expected to have to be funded by the owner.  See Affidavit ¶ 7.  As in the movie, "Casablanca," when the police captain walks into Rick's Cafe and announces with feigned shock that he is "shocked, shocked," to discover that there is "gambling going on in here," PNC pretends to be surprised by the fact that the interest reserve had been exhausted by December 2007.  However, this was precisely the way the loan was budgeted from the beginning.

Moreover, PNC knew full well that the Borrower's owners and the guarantor had more than sufficient resources to pay ongoing interest during the extended loan term, and to otherwise assure repayment of the loan in full.  Indeed PNC's officers acknowledged this fact in discussions with the Plaintiff on multiple occasions.  See Affidavit at ¶¶ 32, 61.  As stated in Plaintiff's Complaint (which PNC did not deny), "at no time during any of these discussions was there ever any doubt that the Borrower had the capacity to fund these interest payments."  The Bank was well aware that the Borrower (which it knew comprised of multiple substantial investors) was more than capable of funding additional interest payments with new funds if necessary.  Even after sending the notice of default, and refusing to fund any remaining draws, PNC officials repeatedly told Schwat that they still expected to be repaid in full, including all interest and late charges! See Affidavit at ¶ 63.

5

It is also interesting to note that PNC conveniently ignores throughout its brief the fact that Steven Schwat, the principal of the Borrower had personally guaranteed the loan in full. Defendant's own exhibits prove that this loan was underwritten as a full recourse loan, i.e. not a "non-recourse" loan in which the bank could look only to the collateral for repayment. Yet PNC's brief completely ignores this fact and instead would have the reader believe that the Borrower was merely a shell entity which had no cash flow or source of funds and therefore could not possibly be expected to make future payments of interest. It is obvious that the resources of the borrower and of the guarantor must be considered in any reasonable and good faith analysis of whether the Bank's prospect of payment or performance has been impaired, just as it was in the initial decision to make the loan. Yet the evidence as presented in support of the PNC's summary judgment motion makes no mention of such an analysis and thus provides strong circumstantial evidence that such an analysis was never made. If discovery confirms that the Bank never made a contemporaneous determination of the financial resources available to the Borrower and the guarantor prior to its declaration of default, the evidence of a lack of good faith (and reasonableness) in supposedly determining that its prospect of repayment was impaired would be quite compelling.

Fifth, contrary to PNC's assertion, the loan documents do **not** require that the loan-to value ("LTV") ratio be maintained at all times at 75%. See Affidavit at ¶ 22. PNC's strained interpretation is based on an out-of context and counter logical reading of the of the commitment letter. PNC concedes that this supposed requirement is not contained in the construction loan agreement, the deed of trust or the deed of trust note. PNC argues, however, that the obligation must be read into those documents because the commitment letter, PNC claims, is one of the "other documents related to the loan" incorporated by reference into the loan agreements. What

6

PNC undoubtedly knows, but does not point out, however, is that the 75% LTV requirement in the commitment letter clearly refers to a <u>condition of closing</u>, not to an ongoing obligation throughout the life of the loan. See page 3 of the commitment letter which lists this condition under the heading: "Government Approvals/Closing Requirements, etc. . . Prior to closing the loan." Indeed, the very document relied on by PNC makes clear that PNC's interpretation is faulty. On page 1 of the commitment letter, there is a calculation, showing that the Bank was funding 80% of the acquisition price (which was identical to the appraisal value at the time) (i.e. an LTV of 80%). Moreover, since the first several fundings were for "soft costs," the parties clearly knew that the LTV would increase with each funding. According to PNC's strained interpretation, the loan would have been budgeted to go into default from day one.

The parties could have agreed to an ongoing LTV test, but they did not. <u>See</u> Affidavit at ¶ 22. Instead, the parties expressly negotiated a different ongoing test, which conflicts with the very idea of an absolute LTV ratio approach. Presumably, the parties at the time believed the tests for default expressly contained in the loan documents were more appropriate for this type of construction loan, particularly one with a full personal guaranty. These tests, which PNC never properly applied either, required a reasonable and good faith determination that the prospect of payment or performance had been impaired or that the absolute (not relative) value of the collateral has been materially impaired. <u>See</u> section 9(k) of the Deed of Trust Note.

As discussed further below, while there will undoubtedly be conflicting opinions of the exact value of the property in this case, <u>any</u> reasonable and good faith opinion of the value of the property would have to conclude that it was substantially more valuable in January 2008 than it was when the loan was made. This should not be surprising since the original collateral on which the loan was made was a piece of land with a old building that needed to be demolished.

7

The property at the time the bank declared a default, on the other hand, was a fully entitled, fully permitted, ongoing construction project with over 1.5 million dollars of value already invested directly in the project on top of the acquisition price. Demolition, excavation, and site utilities were complete, the foundation, garage and cellar floor were done, and generally the 16 unit building was already about a third done. See Affidavit at ¶ 62.

**B. In Addition To The Material Facts In Dispute (From Among Those Defendant Claims Are Undisputed), There Are Also Many Additional Material Facts That Were Simply Ignored By Defendant But Must Be Resolved For A Proper Disposition Of The Merits Of This Case.**

Chief among the disputed facts ignored by Defendant in its Motion is the question of the "reasonableness" of PNC's determination of a non-monetary default based on "impairment." Apparently well aware that questions of "reasonableness" are considered by the courts to be among the most fact-intensive inquiries decided by fact-finders, and almost never appropriate for summary judgment, Defendant chooses to simply ignore this key allegation of Plaintiff's complaint. Indeed, a reader of Defendant's Motion would not even know that there is a "reasonableness" requirement in the written loan documents.

Defendant would have this court believe that a "good faith" determination is the same thing as a "reasonable" determination. Questions of good faith focus on the subjective honesty and intentions of the actor. Reasonableness, on the other hand, is an objective standard, like negligence, which requires conformity to the standards and norms of the community or industry involved. Thus, even if the Bank honestly believed that the value of the property had declined, or that the prospect of repayment had been impaired, that determination would not be "reasonable" unless other banks similarly situated could be expected to reach a similar conclusion with a similar procedure. In this case, PNC's actions were clearly out of the norm and its conclusions about value and of the length of time necessary to complete construction

8

were unreasonable. According to the Riley Appraisal, the value of the property as raw land is the same as the value with a partially complete 16 unit building. This makes no sense.

Moreover, as described in the accompanying Affidavit of Steven Schwat, PNC's actions in this case were completely contrary to the norms of the construction loan industry as he knows them. Schwat and his team have dozens of years of experience as a developer/borrower/banker dealing with construction loans similar to the loan at issue in this case, including loans with PNC's predecessors, Mercantile Potomac and Community Bank of Northern Virginia. According to Schwat, the secretive conduct of PNC in this case was extremely unusual, both in reference to his prior dealings with PNC as well as with other financial institutions. See Affidavit at ¶ 64.

In addition to Schwat's opinion, however, Plaintiff expects to present expert testimony from an experienced commercial lending expert, that PNC's actions in this case, particularly its supposedly secret determination of a default without any notice or discussions with the Borrower as a basis for halting funding in the midst of a construction project, was not commercially reasonable for loans of this type. No reasonable lender would stop funding in the midst of the most sensitive phase of a construction project without first raising its concerns with the Borrower. No reasonable lender would rely on an appraisal that reached an unexpectedly low value conclusion without at least permitting the Borrower to review the appraisal in order to ensure that there were no fundamental errors or faulty assumption made by the appraiser. See Affidavit at ¶ 59.

Plaintiff also expects to present expert appraisal testimony that will establish that the Riley appraisal's value conclusion supposedly relied on by PNC was not within the range of reasonableness, as well as expert testimony from an experienced general contractor who will

9

demonstrate that PNC's supposed determination that construction could not be completed by the end of the loan term was clearly unreasonable.   See Affidavit at ¶ 59.

In addition, PNC has not denied, and in fact has completely ignored in its Motion, the allegations in Plaintiff's complaint concerning the huge improper late charge asserted by PNC in a bad faith attempt to bully Plaintiff into paying off its loan early.  See Complaint at 54; see also Affidavit at ¶ 57.   PNC has also not denied, and completely ignored in its Motion, Plaintiff's allegations that PNC's decisions in this case were influenced by an overall policy decision concerning D.C. loans in general, rather than a good faith and reasonable determination of the facts relating specifically to the Chapin loan. If established at trial, these facts will go a long way to establishing Plaintiff's allegation that PNC knowingly violated the loan terms because of an internal policy decision to stop funding condo construction projects in D.C. and surrounding areas and to look for any way out of its existing obligations, rather than because of a reasonable and good faith analysis of this specific project. [2]

PNC has also not denied, and in fact has completely ignored in its Motion, the allegations in Plaintiff's complaint that PNC was well aware of many of the facts about which it now claims it was concerned when it released, without any consideration, 2 of the 3 original guarantors of the loan.  It strains credulity to believe that PNC would release these guarantors if it genuinely believed that the project was in trouble and its prospect of repayment was impaired.  Discovery of PNC's internal files with respect to the release of these guarantors may go a long way to establishing the pretextual nature of Defendant's default rationale.

While PNC claims that its determination was made in good faith, it is significant to note the glaring omissions from Defendant's Memorandum of any answer to the following obvious

---

[2] The Court may wish to take judicial notice of the widespread  credit problems in the U.S. banking and financial sectors that apparently have led to similar questionable conduct by other banks.  See, e.g., July 23, 2008 Wall Street Journal article: "Builders Sue Banks That Pull Financing As Construction Projects Lie Unfinished."

questions: who actually made this supposed good faith default determination, how was it actually made and when it was made?  Although Mr. Gormley's affidavit indicates that he "issued" the default notice, it does not say that Mr. Gormley made the determination.  One would expect to find documentary evidence of contemporaneous loan committee minutes or notes explaining the basis for such an important determination. Yet nowhere among the affidavits or exhibits provided by Defendant is there any reference to such documents.   Plaintiff expects that discovery of PNC's internal files will shed much light on these questions.

PNC has also not denied, and in fact has completely ignored in its Motion, the allegations in Plaintiff's complaint that PNC's insistence on an appraisal as a condition of the extension constituted a <u>knowing</u> repudiation of the agreement.  Plaintiff expects that discovery of the circumstances surrounding this repudiation by PNC will provide further confirmation of PNC's ulterior motive and knowing violation of its loan obligations.

PNC has also not denied, and in fact has completely ignored in its Motion, the allegations in Plaintiff's Complaint that Borrower was in full compliance with each and every condition of funding with respect to each of the 16 draws that PNC funded, up to and including December 2007.  Each of those draw requests were reviewed by the Bank for compliance with all of the loan conditions to funding; and each of these draws were approved.  There is absolutely no explanation for PNC's conclusory assertion in the Motion that Chapin somehow could not meet these conditions all of a sudden in January 2008.  <u>See</u> <u>also</u> Affidavit at ¶¶ 26, 28, 34-36, 41-42.

II.    **CHAPIN GAVE A PROPER AND EFFECTIVE NOTICE OF EXTENSION AND WAS NOT IN DEFAULT AT THE TIME**

PNC does not deny that Plaintiff delivered a written notice of extension of maturity to a PNC official involved in this loan which was actually received before PNC ever gave notice of

11

an alleged default. [3]  Apparently recognizing the potentially fatal blow that this fact has to one of the key underpinnings of its position - that this was a matured loan  -  PNC argues strenuously that the notice was somehow technically defective.

PNC makes two points to try to challenge the effectiveness of the extension notice.  First, PNC argues that the notice was ineffective because it was addressed to the "wrong address."  Second, PNC argues that Chapin had no right to give the notice since they were already in default, even though they didn't know it yet.  As demonstrated below, neither of these points have merit.

### A. PNC'S "Wrong Address" Argument Is Based On A Hypertechnical And Illogical Reading Of Its Own Out Of Context Paraphrase Of The Agreement.  In Fact, Chapin Street Complied With Both The Letter And The Spirit Of The Actual Language Of The Agreement

PNC's memorandum raises its technical "wrong address" argument without quoting from the actual language of the relevant provision.  Instead, PNC relies on its own paraphrase of that provision.  Unfortunately, PNC's paraphrase leaves out two material provisions of the language.  First, the language provides two separate and alternative methods of giving notice.  One method, completely ignored by PNC, is the one that was used in this case - - hand delivery.  The actual language of this part of the provision reads:

> "All notices, demands, requests and other communications permitted or required pursuant to the provisions of this instrument shall be in writing and shall be deemed to have been properly given or served for all purposes on that day when actually presented personally <u>by hand delivery</u>, or. . . "

(Emphasis Supplied).

There is no question that the hand delivery alternative is intended to be a separate and independent mechanism for notice.  This is supported by the grammar and syntax of the

---

[3] It is curious that in all of the affidavits and materials provided by Defendant with its Motion, it does not affirmatively acknowledge this indisputable fact.  For the purposes of this motion, however, the Court must of course treat this fact as conceded.

12

language, and well as by common sense interpretation.  First, read literally, it is clear that the hand delivery alternative is set out from the other alternative by a comma and the disjunctive "or."  Second, common sense compels the conclusion that hand delivery need not be restricted to a particular address since the point of a notice provision is to ensure that notice makes it to the intended party.  If one is meeting face to face, for example, one can simply hand the document to the other party and notice is assured.  Does PNC really contend that if PNC officials were having a meeting with Chapin at their office in Maryland, that Chapin could not simply hand the notice to PNC at that time, but instead the parties would have to get in their cars and drive to the former Mercantile address in Virginia for a kind of hand off ceremony?  The final common sense nail in the coffin of PNC's illogical "wrong address" argument is the fact that the address listed in the documents for mail notice to Borrower is a P.O. Box.  It is of course physically impossible to receive hand delivery in a P.O. Box.

The other method, the one not used in this case, but relied on by PNC in its argument, is mail or overnight delivery.  Even this provision is inaccurately paraphrased by PNC.  The actual language is:

> "or the day after deposit with a nationally recognized overnight express delivery/courier service, charges prepaid, or three (3) days after deposit in the U.S. mail, postage prepaid, as registered or certified mail, return receipt requested, properly addressed to the respective addresses, as follows:  if to Bank at 8150 Leesburg Pike, Suite 310, Vienna, Virginia 22182, and if to Grantor at P.O. Box 71007, Chevy Chase, Maryland 20813 . . . , or such other address as the Grantor, the Bank or the Trustees shall have furnished to the others in writing, mailed as aforesaid."

(Emphasis supplied)

In this case, as demonstrated by the Affidavit of Schwat attached hereto, PNC moved its administrative offices around the time that this loan was closed and did indeed advise Chapin to send future notices to the new address, which new address was provided to Chapin, "in writing."

13

Indeed, prior to the extension notice, Chapin sent multiple notices and communications to this new address, as advised by PNC, including at least 16 formal draw requests, and all were accepted without objection. And all of the communications from PNC since that time contained this new address. See Affidavit at ¶¶ 48, 60.

PNC's statement at page 34 of its memorandum that the mailing address in the notice 'is and has always been an office of PNC (both before and after the acquisition)" is misleading to say the least. Note the reference in the notice provision quoted above to "Suite 310." This loan was originally made with Mercantile, a bank that was subsequently acquired by PNC. The administrative offices for Mercantile were in offices on the third floor of a building above one of its branches, in Suite 310. However, PNC acquired Mercantile and moved these administrative offices to Boone Boulevard. As noted above, the loan officers involved in Chapin's loan informed Chapin (as would be expected) of this move and instructed Chapin to send all future communication to them at the new address. See Affidavit at ¶ 60. In fact, the old third floor location of the Mercantile administrative offices were closed shortly thereafter and the space is now occupied by a unrelated party. The only thing left at the address is the bank branch downstairs on the first floor. Does PNC seriously contend that Chapin was supposed to deliver the notice to a bank branch which has nothing to do with this loan, rather than to the individual who is directly involved in the loan?

Even assuming, *arguendo*, that the language of the notice provision should not be read in its proper grammatical sense, Chapin's notice would still be effective since it is undisputed that the notice was actually and timely received by PNC. Contrary to the implications of PNC's paraphrase, the actual language of the notice provision does not set out an exclusive method of notice. Rather, it is clear on its face that the language is merely permissive. By its terms, the

14

notice provision simply provides a method for notice which, if employed by a party, will be "<u>deemed </u>to have been properly given." (emphasis added)  In other words, the provision provides a kind of fail-safe.  Nothing in the agreement states that this is the exclusive method of notice.

Similarly, PNC's argument that strict compliance with the address part of the notice provision must be read as a kind of condition precedent to extension of the loan, and that that condition had to be followed strictly, is without merit.  Aside from the fact that Chapin did strictly comply with the language of the relevant provision (as demonstrated above), nothing in any of the documents or the case law cited by PNC remotely suggests that actual and timely hand delivery of the notice is not adequate for purposes of the extension request.

As explained in the Affidavit of Steve Schwat, the loan was negotiated to have effectively a three year term, but was structured with a two year base period and two six month extensions.   If the borrower could finish early, he could save some money by not having to pay the two extension fees.  The right of extension was a key and important provision of the loan agreement which was one of the more important last changes before the commitment letter was signed.[4]  As explained by Schwat, the intent of this provision was to provide an automatic right to a third year without the need for new underwriting or reappraisal. The only conditions to extension were in the nature of ministerial acts - sending the notice and payment of an extension fee as long as the loan was not in default.  <u>See</u> Affidavit at ¶¶ 17-18.

Further support that the delivery to the correct address was not a condition precedent as argued by Defendant can be gleaned from the language of the agreement itself.  As Defendant's own case citations make clear, condition precedent language is usually preceded by words such as "if" or "provided that." <u>See</u> <u>e.g.</u> <u>Chirella v. Erwin</u>, 270 Md. 178, 182, 310 A.2d 555, 557 (Md.

---

[4] PNC's characterization of this change its Statement of Material Facts number 4 as "minor" is an example of the kind of distortions contained throughout.

15

1973).  In this case, the language does not contain any such words.  Instead, the agreement provides simply that "upon maturity, the Lender shall grant two (2) consecutive six (6) month extensions of the due date upon written request of Borrower."[5]

### B.  Contrary To PNC'S Argument, The Loan Documents Do Not Permit A Secret Default Without Any Notice Or Opportunity To Cure.

PNC's second argument, that Chapin was in default at the time of the extension request, even though they didn't know it, is based on an incorrect interpretation of the agreement and applicable law.  At best, there is a serious and genuine dispute as to facts necessary to determine whether the loan was in default at the relevant time.  This dispute can only be resolved by presentation of evidence to a fact finder who will be able to judge the credibility of lay and expert witnesses.

Nowhere in the loan documents does it say that Chapin can be declared in default "without notice" or any similar language to that effect.  PNC argument relies entirely on an implication.  PNC's reading of the documents - - that because no specific time period is mentioned, it can declare a secret and immediate default without any notice or opportunity to cure -  is inconsistent with the natural reading of the agreement, the clear intent of the parties (see Affidavit at ¶¶ 55-56), commercial practice, and case law interpreting similar provisions.

1. **When no specified time for notice or cure is provided, the law assumes a notice and cure period that is reasonable under the circumstances. A *fortiori*, when, as in this case, the parties have specifically negotiated for the inclusion of the words "reasonable" and "good faith" in a default provision, a reasonable notice and cure period is required**

---

[5] PNC's gratuitous suggestion on page 34 of its brief that Plaintiff didn't attach the notice letter because we knew that we sent it to the wrong address is absurd.  As noted, PNC's wrong address argument comes as a complete surprise to Chapin.  Despite multiple conversations with PNC representatives after default, including written communications explaining the parties' respective positions, and multiple conversations among counsel, PNC never once made this argument.  We simply never thought the method of delivery of our notice was an issue.

16

When a contract fails to specify a time for the performance of an act, "the law implies that it must be done within a reasonable time." Independence Mgmt. Co., Inc. v. Anderson & Summers, LLC, 874 A.2d 862, 869 (D.C. 2005); see also Flack v. Laster, 417 A.2d 393, 400 (D.C. 1980); Drazin v. American Oil Co., 395 A.2d 32, 34 (D.C. App. 1978); *cf.* Restatement (Second) of Contracts § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is *reasonable* in the circumstances is supplied by the court.").

The absence of a specified time for cure requires that the Borrower be given a reasonable time under the circumstances. The courts have recognized that the common law right of a cure is imbedded in the natural meaning of "materiality." See, e.g., *Bruner and O'Connor on Construction Law* § 18:15:

> "A breach cannot be said to be material if it is curable, notice to cure is given, and prompt steps are taken to cure or to offer assurances of cure. The right of a breaching party to be given an opportunity to cure its own material breach is an ancient equitable principle intended (1) to prevent forfeiture by termination, (2) to allow the breaching party to mitigate damages, (3) to avoid similar future deficiencies in performance, and (4) to promote the informal settlement of disputes. Cure is relevant to materiality by virtue of its focus on elimination of the breach and its implied assurance of intent to render adequate future performance. Unless expressly waived, the right to cure is implied in every contract as a matter of law."

(Emphasis added)

This same rationale was used by this Court in Country Club Associates Ltd. Partnership v. F.D.I.C., 918 F.Supp. 429 (D.D.C. 1996). In that case, this court, applying Virginia law, held that that the refusal of a savings and loan receiver to honor draw requests without notice or explanation constituted a breach of the agreement. The Court explained that "notice and an opportunity to cure are required unless 'the parties, by agreement, abrogate such common law

17

principles. . . .'" Id. at 435 (quoting R.W. Power Partners, L.P. v. Virginia Elec. and Power Co., 899 F.Supp. 1490, 1495 (E.D. Va. 1995)).

PNC in its memorandum never analyzes the actual language of the applicable provision. Instead, PNC prefers to rely on its own shorthand description, which it refers to as a "Material Adverse Change" provision, and on its own paraphrase of that provision.  According to PNC's Memorandum: "The deed of trust makes a good faith determination by PNC of a material adverse change an immediate default, without the need to give notice or an opportunity to cure. Lets review the actual language.   Where does it say "immediately?"  It doesn't.  Where does it say "without notice?"  It doesn't. What happened to the specifically negotiated requirement that the determination be "reasonable?"  Ignored by PNC.

PNC acts as if all material adverse change provisions are alike.  Of course that is not true. In this case, there are three separate tests in section 9(k) of the Note, only one of which, section 9(k)(iii) was relied on by PNC in its default notice. Since PNC simply uses shorthand to describe its determination of material adverse change in its summary judgment motion, however, it is not clear whether PNC is attempting to expand its justification at this time.

Since the agreement clearly requires an affirmative determination, PNC can not now change history and justify its actions by making a determination that was never made.  Even assuming, arguendo, that they can retroactively make such a determination, there is no question that the reasonableness and good faith nature of that determination would be in serious dispute.

As noted, PNC uses the shorthand phrase, "material adverse change," to refer to the entire provision at issue. However, by its terms, the phrase "material adverse change" only applies to the first test, which relates to the financial condition of the Borrower.  Yet there is nothing in any of PNC's papers which even alleges that there has been a material adverse change in the

18

Borrower's financial condition, let alone that PNC ever attempted to make a determination to that effect.  Instead, PNC in its default notice relied only on the third test, 9(k)(iii), relating to an alleged impairment of the "prospect of payment or performance."  However, since PNC seems to be relying on both the second and third tests in its Memorandum, they will both be discussed below.

A review of the actual language of the provision makes clear that the following conditions or prerequisites must be met before there can be a default:

- as to both tests,  the determination must be reasonable;

-  as to both tests, the determination must be in good faith;

- as to the second test, the value of the property must be materially impaired (note that this is an absolute and not a relative (i.e. LTV) concept);

- as to the third test, there must be a identifiable "event or condition,"

-  as to the third test, the prospect of payment or performance must have been impaired by that event or condition.  Note that this test is obviously not the same as the property value test in 9(k)(ii).  9(k)(iii) is obviously meant to include consideration of the strength of the guarantor and other sources of payment as well.

As to the value of the property test in 9(k)(ii), Plaintiff's evidence will demonstrate convincingly that the value of the property was substantially higher at the time PNC declared a default than when the loan was made.  See Affidavit at ¶ 59.  This is not surprising since the property was originally a piece of land with an old building that needed to be demolished, while at the time of alleged default, the property was in the midst of construction of a 16 unit building with over 1.5 million dollars invested in the project (on top of the acquisition price) since the date of closing.  PNC claims to disagree with these value conclusions, and relies on the Riley

19

appraisal to state that it held its belief in good faith.  Whether PNC's reliance on that appraisal was reasonable and in good faith, however, are serious questions for the trier of fact.  What is undisputed is that PNC had already repudiated its obligations under the agreement even before they had ordered the appraisal.

As to the "event or condition that impairs the prospect of payment" test, nowhere in PNC's Memorandum or default notice has PNC pointed to an event or condition that they claim caused the alleged impairment.  Note that the language of the provision, by its express terms, does not simply permit an amorphous determination of impairment, but requires an identifiable "event or condition."  Shortly after receiving PNC's default notice, Chapin asked PNC to identify the event or condition about which they were concerned.  They refused to do so and have not done so to date, even in their summary judgment motion.  See Affidavit at ¶ 51.

Moreover, even assuming, *arguendo*, that the words "event or condition" are superfluous, PNC would still have to make a reasonable determination in good faith that the prospect of payment or performance has been impaired.  Given the fact that PNC was well aware of the existence of a full guaranty from the principal owner of the Borrower, it is hard to see how they could possibly reach this conclusion.  The existence of a guaranty is obviously a relevant and important factor in analyzing whether the prospect of payment has been impaired.  Perhaps this explains why PNC completely ignores the existence of the guaranty in its Memorandum.

As described in the Affidavit at ¶ 32, Steve Schwat specifically informed PNC that he was prepared to invest substantial additional funds into the project, and that he had more than sufficient funds on hand to meet all future obligations, including future interest.   PNC's response was that of a typical banker- - that they would consider extending additional credit to Borrower for these needs.  Certainly this is not the response of a lender who genuinely believed

20

that its prospect of payment was impaired.  Perhaps the most convincing evidence that PNC did not make a reasonable and good faith determination that an event or condition had impaired their prospect of repayment can be found in the repeated statements of PNC officials to Borrower, even after the alleged default, that PNC still anticipated to be paid in full, including all interest and late charges. See Affidavit at ¶ 63.

The Affidavit of Schwat clearly demonstrates Chapin's expectations and contractual intent with respect to the inclusion of the words "reasonable and good faith" in the default clause.  According to Schwat, "never in a million years would I believe that that clause could be interpreted to mean that I could be in default without knowing it." Affidavit at ¶ 55. Schwat's expectations are consistent with the common understanding of those terms and are also consistent with the common law principles articulated by the courts when there is no specified notice period. Moreover, Plaintiff' expects its commercial banking practices expert will testify that Schwat's understanding was consistent with commercial practice and the common understanding of these provisions by other members of the banking industry.

The loan agreement must be read with its natural common sense meaning.  It is simply impossible under the circumstances of this case for PNC to have made a reasonable and good faith determination of impairment necessary to stop funding in the midst this complex construction project without first raising their specific concerns with the Borrower.  The only rational explanation for their failure to do so is to gain an unfair commercial advantage by presenting the Borrowers with a manufactured crisis without any notice or opportunity to address the supposed problem.  This is precisely what happened in this case.  Indeed, not only did the Bank go back on the word of its appraiser to allow the borrower to review the appraisal and then refuse to disclose any of its conclusions, but the bank simultaneously added an

outrageous late charge, which it knew to be improper, and insisted that it would only remove the charge if the Borrower paid off the loan one year earlier than agreed.

**2. Insecurity clauses must be scrutinized carefully to ensure that they are not utilized as a sword to gain an unfair commercial advantage**

Courts have held that one may establish a bank's failure to act in good faith by showing that the bank, without giving the plaintiff adequate notice, took action that contravened the plaintiff's reasonable expectations and was likely to adversely effect the plaintiff. See Spencer Companies, Inc.  v. Chase Manhattan Bank, N.A., 81 B. R. 194 (D. Mass 1987); See also C-K Enterprises Inc. v. Depositors Trust Co., 438 A.2d 262 (Me. 1981)   Failure to give a borrower sufficient notice of an impending termination of a debtor's credit, so that the debtor has an opportunity to secure other financing, has also been held to be unreasonable. See, e.g., Reid v. Key Bank of Southern Maine Inc., 821 F.2d 9 (1st Cir. 1987); KMC Co. v. Irving Trust Co., 757 F.2d 752 (6th Cir. 1985).  Even if the bank had an absolute right to terminate the credit under the loan agreement, the obligation of good faith required a period of notice to allow the plaintiff a reasonable opportunity to seek alternate credit. Components Direct v. European American Bank, 572 N.Y.S.2d 359 (N.Y. App. 1991).  Moreover, other courts have held that if the bank were truly concerned about financial problems or impairment of collateral, the bank should have at least contacted the debtor before making a decision to repossess collateral or accelerate a loan. See Blades v. White Motor Credit Corp., 750 P.2d 1198 (Or.  App. 1988).

Courts have recognized that a bank's exercise of insecurity clauses must be scrutinized with particular care.  As the court in America Bank v. Waco Airmotive, 818 S.W.2d 163 (Tex. 1991) explained:  "Feelings of insecurity are largely subjective and by their very nature subject to abuse by a creditor who arbitrarily and capriciously uses acceleration as a sword to gain commercial advantage rather than as shield for protection against any actual impairment of the

22

security." Citing Brown v. Avemco, 603 F.2d 1367, 1376-79 (9th Cir.1979), the court further explained: "Acceleration clauses are designed to protect the creditor from actions by the debtor which jeopardize or impair the creditor's security. They are not to be used offensively, e.g., for the commercial advantage of the creditor. Acceleration is a harsh remedy with draconian consequences for the debtor. Acceleration is a matter of equity and the courts . . . have historically been careful to evaluate the fairness of acceleration in the particular facts of a case." Id.; see also J.R. Hale Contracting Co., Inc. v. United New Mexico Bank at Albuquerque, 799 P.2d 581, 591-592 (N.M. 1990) ("We agree with the trial court that the company introduced sufficient evidence to establish a prima facie case of the lack of good faith on the part of the bank. Notwithstanding the company's profitability problems and declining working capital position, a banking expert testified that the bank's collateral position was more than adequate. Additionally, . . . the company had . . . more than enough funds to cover the interest payment. This evidence is sufficient to require that the issue be resolved by the fact finder under the standard of good faith necessary to justify acceleration of payments under an insecurity clause.")

As the Court explained in County Club Assoc., supra, at 435: "the requirement that a party provide notice of default and at least a brief opportunity for the other party to cure its breach of a contract protects against unnecessary disruption in business. Parties to a lending agreement . . . count on the agreement enduring long enough for the project for which the funds are being borrowed to be realized. They will order their conduct accordingly and rely on the agreement in planning related transactions. Thus, it makes sense that notice and an opportunity to cure are required unless the parties, by agreement, abrogate such common law principles." Of course, Chapin never agreed to abrogate its common law rights in this case.

23

**III.   SPECIFIC PERFORMANCE IS AN AVAILABLE REMEDY WHICH MAY VERY WELL BE APPROPRIATE IN THIS CASE BASED ON THE SOUND DISCRETION OF THE COURT. HOWEVER, THIS COURT NEED NOT REACH THE ISSUE OF REMEDY AT THIS TIME SINCE PNC CONCEDES THAT DAMAGES ARE AN APPROPRIATE REMEDY AND PLAINTIFF IS SEEKING DAMAGES[6]**

Because PNC concedes that damages are an appropriate remedy, and Chapin in its Complaint clearly seeks damages as well as specific performance for PNC's breach, this Court need not reach the question of the appropriate remedy at this time.   PNC apparently realizes the fundamental flaw in its argument and so attempts to distract the focus from Chapin's damages claim by providing its own self-serving characterizations of Chapin's Complaint. On page one of its motion, PNC states: "This is a suit for specific performance."  What about the damages requested by Plaintiff?  They don't even rate as much as a passing mention in PNC's Motion. PNC's supporting memorandum at least gives a passing hint on page 36 to the fact that Chapin also seeks damages.  But again, PNC's self-serving mischaracterization is that Chapin "principally" asks the Court for a decree of specific performance.  Where does that characterization come from?  PNC's paraphrase of Chapin's Complaint is no more credible than its paraphrase of the language of the agreement.

Chapin is, of course, the master of its own Complaint.  The actual language of its Complaint makes clear that Chapin seeks alternative, and/or potentially complementary, remedies.  Quoting: "*Wherefore*, Plaintiff prays that it be awarded the following damages and/or

---

[6] Section 9.8 of the Construction Loan Agreement specifically states that it will be governed by D.C. law. The Deed of Trust also is governed by D.C. law (see section 5.08), and the collateral is located in D.C.  Section 19 of the Deed of Trust Note, however, states that it is governed by Maryland law.  While Plaintiff does not believe there is any material conflict in the substantive law of D.C. and Maryland with respect to the issues in this case, if there were such a conflict, D.C. law would undoubtedly apply to the following questions: whether PNC's actions constituted an anticipatory repudiation or breach of its obligations under the Construction Loan Agreement; whether that agreement was properly extended and the adequacy of the hand delivered notice; and whether specific performance is an appropriate remedy under the circumstances.  Maryland law, perhaps, might be applied to questions of the intepretation of clauses that are unique to the Note.

24

equitable relief…" Neither of the requested remedies can fairly be said to be the "principal" remedy.  In fact, as noted above, the request for damages are estimated in the Complaint at "no less than 2 million dollars."

As discussed further below, this Court has more than sufficient power and authority to fashion an appropriate remedy in this case.  While the precise outlines of such a remedy need not be determined until after the presentation of the evidence, Plaintiff respectfully suggests that because damages may not be adequate to fully remedy the consequences of PNC's breach, this is precisely the kind of case where specific performance may be appropriate for at least a portion of the remedy, probably in combination with an award of damages.

### A. Specific Performance Is Widely Recognized As An Available Remedy For Breach Or Repudiation Of A Construction Loan In Cases Such As This

PNC's brief cites to a variety of cases which it claims supports its position that summary judgment should be granted because specific performance is not an available remedy for the breach of an agreement to lend money as a matter of law.  A review of PNC's citations, however, reveal that they do not support the proposition for which they are offered.  First of all, not a single one of Defendant's cases involve a construction loan.  Secondly, the courts in most of Defendant's cases actually acknowledged the availability of specific performance in appropriate circumstances and generally held a trial before reaching a decision.  Third, Defendant ignores the existence of D.C. precedent recognizing the availability of specific performance where construction was involved (discussed further below).

A review of the Maryland and D.C. cases cited by Defendant is instructive.  In Archway Motors, Inc. v. Herman, 378 A.2d 720 (Md. Ct. Spec App. 1977), the Court of Appeals reversed the denial of specific performance and actually indicated that specific performance was the preferred remedy.  In Cattail Assoc. Inc. v. Sass, 907 A.2d 828, 884 (Md. 2006), the court

25

acknowledged that the granting of specific performance was within "the sound discretion of the court."  In 8621 Ltd P'ship v. LDG, 900 A.2d 259, 274 (Md. Ct. Spec. App. 2006), the court explained that "[t]he decision to order specific performance is within the sound discretion of the trial court." In Flack, 417 A.2d 393 (D.C. 1980), the court actually granted specific performance, citing Ammerman, which is discussed further below.  In Tauber v. Quan, 938 A.2d 724 (D.C. 2007), the court affirmed the award of specific performance as an appropriate exercise of sound discretion of the trial court.  In Independence Management v. Anderson & Summers, 874 A.2d 862, 870 (D.C. 2005), the court affirmed an award of specific performance, noting that "when land is the subject matter of the agreement, the legal remedy is assumed to be inadequate," and noting further that  "specific performance is a purely equitable remedy that rests in the discretion of the court."  In Clay v. Faison, 583 A.2d 1388, 1391 (D.C. 1990), the court affirmed the award of specific performance, noting that such an award is appropriate where damages are "inadequate or impractical" and noting further that "where land is the subject matter of the agreement, . . . the legal remedy is deemed inadequate, since each parcel of land is unique and damages would not adequately compensate for a breach."

PNC does acknowledge in passing that even its own cases recognize that specific performance is available in "unusual or compelling circumstances."  PNC never discusses, however, what the courts have meant by unusual or compelling circumstances.  This is not surprising.  A review of the case law reveals that the clear modern trend is to recognize that breach of a construction loan, particularly in the midst of construction as occurred in this case, would be precisely the kind of unusual and compelling circumstance which would justify an award of specific performance.

As summarized by the author of the ALR annotation, *Specific Performance of Agreement to Lend or Borrow Money*:

> "The more recent cases have shown a greater recognition by the courts of the existence of exceptional circumstances justifying the granting of specific performance, <u>particularly in those cases involving construction loans</u>. Specific performance has been granted or its granting has been held supportable <u>where the construction loan was performed in part</u> or was wholly executory."

82 ALR3d 1116 (emphasis added).

In <u>Ammerman v. City Stores</u>, 266 F. Supp 766, 776 (D.D.C. 1967), <u>aff'd</u>, 394 F.2d 950 (D.C. Cir. 1968), the court explained:  "Some jurisdictions in the United States have opposed granting specific performance of contracts for construction of buildings and other contracts requiring extensive supervision of the court, but the better view, and the one which increasingly is being followed in this country, is that such contracts should be specifically enforced unless the difficulties of supervision outweigh the importance of specific performance to the plaintiff."

The case of <u>Selective Builders, Inc. v Hudson City Sav. Bank</u>, 349 A.2d 564 (NJ Super 1975), in which plaintiff builders sought specific performance of a construction loan agreement is instructive in that the Court dealt with similar facts to those of the instant case.  In that case, the Court held that specific performance should be granted, noting that the builders would stand to lose their equity in the project and their substantial investment of time and effort. Furthermore, the court noted that the principal stockholders and officers of the builders personally guaranteed the note and would therefore be liable in any deficiency proceeding thereon. . . . .  The court noted that, in other jurisdictions, it had been held that land was unique and an agreement to lend money by mortgage, like an agreement to buy land, could be specifically enforced. The court concluded that it would be difficult to calculate the damages sustained by the builders by reason of the breach of the bank and also that any damages awarded would not make the builders whole.

27

The court declared further that the rights of third parties would be prejudiced if only damages were awarded and that clearly, there was no adequate remedy at law that would fully compensate the builders for the bank's breach.

In Southampton Wholesale Food Terminal, Inc. v. Providence Warehouse Co., 129 F.Supp 663, 664 (D. Mass. 1955), the Court denied the defendant's motion to dismiss a complaint, in which the plaintiff sought specific performance of a construction loan agreement. Recognizing that, as a general rule, "an agreement to lend money is not generally specifically enforced," the Court stated however "that cases of construction mortgages were an exception." The court explained that "since the law regards land as unique," and has long acknowledged that "an agreement to buy land can be specifically enforced even though the defendant's sole obligation is to pay money," the same rationale should apply to advances under a construction mortgage. Id.

In Jacobson v. First Nat'l Bank of Bloomingdale, 20 A.2d 19 (N.J. Ch. 1941), the court held that specific performance of a construction loan agreement should be granted. . . . The court rejected as unsound contentions that the plaintiffs had an adequate remedy at law by a suit against the bank.   The court reasoned that the bank had an agreement with the plaintiffs to lend a second installment when the house was brown-plastered and that by failing to make the second installment, the Borrower was in the position of having an uncompleted house on which it would be difficult if not impossible to borrow additional money elsewhere for its completion.

Affirming a lower court's judgment for specific performance, the court in Camden v. South Jersey Port Com., 73 A.2d 55 (N.J. Super. Ct. Ch. Div. 1950), held that a claim for payments of moneys agreed to be advanced for construction should be specifically performed. . . . As the Court explained, after making several payments the defendant  stopped making further

28

payments pursuant to the agreement. The court reasoned that while it is true that, as a general rule, equity will not decree specific performance of a contract to lend money, nevertheless, where the circumstances are such that specific performance is the only method by which full relief can be granted, it is well within the power of the court to do so. Otherwise, the entire project would come to a halt and the rights of third parties who had relied upon it would be irreparably injured. See also First Nat'l State Bank v. Commonwealth Federal Sav. & Loan Assoc., 610 F.2d 164 (3rd Cir. 1979)  (Decree of specific performance held appropriate in action by developer of shopping mall for breach of loan commitment since contract was unique, in that similar financing could not be readily obtained, and since damages suffered were not susceptible to accurate calculation.);  McErlean v. Union Nat'l Bank, 414 N.E.2d 128 (Ill. App. Ct. 1980) (approving of a decree of specific performance in the case of a construction loan contract, noting that the general rule that equity will not countenance action for specific performance of agreements to lend money is subject to exception where the borrower has substantially changed his position in reliance on promise to loan him money in future); See also United California Bank v. Prudential Ins. Co. of America,  140 Ariz. 238, 291, 681 P.2d 390, 443 (Ariz. Ct. App. 1983) (Because the "lender knows that all parties involved will rely on his promise to lend, specific enforcement of that promise presents no undue hardship when it appears that the risk realized was one assumed by the lender, since he is only being compelled to do that which he promised to do").

It is equally clear that in an appropriate case, a court can grant both specific performance and damages.  In Selective Builders, Inc. v Hudson City Sav. Bank, 349 A.2d 564 (NJ Super 1975), for example,  the court, in addition to granting the remedy of specific performance, awarded incidental damages incurred as a result of the refusal by the bank to consummate a

mortgage loan. The court stated that it had the authority to award such damages in those cases where a judgment for specific performance did not in itself give complete relief.  See also Easton Theatres, Inc. v. Wells Fargo Land and Mortg. Co., Inc., 401 A.2d 1333, 1342 (Pa. Super. Ct. 1979), in which the Court held that it was reversible error to deny Plaintiff damages for lost profits even though he was also granted specific performance, noting that "(s)pecific performance at the end of a protracted litigation and under compulsion is practically never full performance of the contract; instead, there has been an extensive and injurious partial breach. In such a case, the court should decree the payment of damages for the partial breach that has already occurred, even though obedience to the decree will prevent the commission of further breaches."  See also Independence Mgt, 874 A.2d at 871 ("We also note that specific performance is an *equitable* remedy, and in this case we believe that equity supports the judge's decision notwithstanding a change in the market value of the property during the intervening period.")

The courts have recognized that the theoretical availability of damages is not enough to preclude the award of specific performance in a real estate or construction loan case since the damages are often  uncertain and difficult to calculate and may not afford complete relief.  In Archway Motors v. Herman, 37 Md.App. 674, 378 A.2d 720 (Md. 1977), a case cited by PNC, the Maryland court reversed the trial courts denial of specific performance, holding that the right to damages did not bar specific performance in that case. Recognizing that whether to grant specific performance is generally within sound discretion of the trial court, the appellate court nevertheless found that the trial court abused it discretion in denying specific performance on the ground that damages were theoretically available.  The court explained:

> "Now, the difficulty of proving the actual value of the land makes the standard by which
> the vendor's damages are to be measured exceedingly uncertain. . . .  In this situation,

30

> confronted in a Court of law by a standard as a measure of damages which would be uncertain in its result for such a breach, there can be no adequate remedy for the vendor other than in a Court of Equity . . ."

Id. at 725; see also McKeever v. Realty Corp., 37 A.2d 305, 310 (Md. 1944) ("The reason for the rule is that the measure of damages in a court of law for breach of a contract for conveyance of land is uncertain, and there can be no adequate remedy other than in a court of equity where specific performance can be decreed.")

In sum, the courts have articulated various rationales for the grant of specific performance of a construction loan, including, 1) that real estate ("land") is unique; 2) real estate is not a commodity and therefore damages are often uncertain or difficult to measure especially in the case of the breach of a construction loan agreement; 3) the impact on third party subcontractors and others affected; 4) that the borrower has often substantially changed its position in reliance on the promise to lend; 5) the unfairness to guarantors who may be liable for a deficiency in the case of a foreclosure, and 6) general principals of equity and fairness. Significantly, this case presents a fact pattern where every one of these rationales are present.

### B. PNC's Claim That Granting Specific Performance Would Present Insurmountable Difficulties of Supervision Is Greatly Exaggerated

There is a detailed agreement between the parties which worked well until PNC chose to repudiate it. PNC funded the first sixteen construction draws without problem. There is simply no reason to suspect that PNC will not obey an order of this Court to perform its obligations under the agreement. Certainly, a knowing breach of an agreement is very different than a knowing breach of a court order. As the Court wrote in Archway, *supra*, at 686, in reversing the trial court: "It is clear that the only reason the chancellor denied [specific performance] . . . was his suspicion that appellee would ignore the decree and his concern over what may be required to

31

enforce it…  [I]t was not appropriate for the chancellor to have assumed that appellee would ignore the decree."

Similarly, the D.C. trial court in Ammerman, 266 F. Supp at 778 (D.D.C. 1967), aff'd, 394 F.2d 950 (D.C. Cir. 1968), wrote: "The defendants contend that the granting of specific performance in this case will confront the court with insuperable difficulties of supervision, but after reviewing the evidence, I am satisfied that the standards to be observed in construction of the plaintiff's store are set out . . . with sufficient particularity as to make design and approval of plaintiff's store a fairly simple matter, if the parties deal with each other in good faith and expeditiously, as I shall hereafter order." The same rationale applies here.

It is perhaps also worth pointing out that PNC's characterization that Plaintiff is seeking to force PNC to lend more than the original loan amount, or to extend the loan term is simply incorrect.  Plaintiff is ready, willing and able to perform in accordance with the original terms of the agreement, without additional funds from the bank or additional time (other than the restoration of time that has been lost as a result of PNC's breach).

IV.   PNC'S WRONGFUL REPUDIATION OF THEIR OBLIGATIONS UNDER THE LOAN EXCUSED FURTHER PERFORMANCE BY BORROWER AS A MATTER OF LAW PENDING RECEIPT BY BORROWER OF SATISFACTORY ASSURANCE OF COMPLIANCE BY PNC

It is a basic principal of contract law that "a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises is that there be no uncured material failure by the other party to render any such performance due at an earlier time.  See Restatement (Second) of Contracts § 237. Moreover, it is equally clear that an anticipatory repudiation operates as a breach for this purpose. Restatement 2d of Contracts § 253 ("Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for

32

damages for total breach.  Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance.")  <u>See</u> <u>also</u> 17A Am Jur, 2d Contracts § 688 ("After one party to a contract repudiates it or refuses to perform, the other party is not obligated to perform, nor, as a consequence, becomes liable for damages."); <u>see</u> <u>also</u> <u>United California</u>, 140 Ariz. at 277, 681 P.2d at 429 ("if one party unequivocally indicates he will not perform when the date arrives, an anticipatory breach is committed.")  Accordingly, by the time PNC claims Chapin was in default, PNC was already in breach and Chapin was legally excused from further performance.

### A.  The Insistence By One Party Upon Terms Not Contained In A Contract Constitutes An Anticipatory Repudiation

To Schwat's surprise and dismay, PNC, on December 4, 2007, unequivocally stated that it would not extend the loan without first having a reappraisal of the property.  Affidavit at ¶¶ 6, 38.  By imposing a condition to extension which was clearly not part of the parties' bargain, PNC unquestionably repudiated the agreement.  <u>See</u> Comment to Restatement (Second) of Contracts  § 250 ("Language that . . . 'amounts to a statement of intention not to perform except on conditions which go beyond the contract' constitutes a repudiation.")

Moreover, it doesn't matter that a party may mistakenly believe that the contract permits the condition.  "A party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty, even if he does so in good faith."  Restatement (Second) of Contracts<u> </u>comment d, at 274-75 (1981);  <u>United California Bank v. Prudential Ins. Co. of America</u>,  140 Ariz. at 278-279, 681 P.2d at 430-431 ("Whether a party repudiates its contract obligations on the basis of an alleged "contract interpretation" or for some other reason is legally irrelevant; one party's "insistence upon terms which are not contained in a contract constitutes an

anticipatory repudiation thereof."). See also Conrad Brothers v. John Deere Ins. Co., 2001 WL 1615459 (Iowa 2001) (a good faith dispute by a party will not prevent a statement from becoming a repudiation) . "Whether a party repudiates its contract obligations on the basis of an alleged "contract interpretation" or for some other reason is legally irrelevant; one party's "insistence upon terms which are not contained in a contract constitutes an anticipatory repudiation thereof." REA Express, Inc. v. Interway Corp., 538 F.2d 953, 955 (2d Cir.1976) (repudiation based upon party's faulty interpretation of "conditions precedent" in contract).

The *Restatement, Corbin* and *Williston,* the three leading authorities on American contract law, unanimously endorse the position that an anticipatory repudiation may be based upon an erroneous contract interpretation just as it may be based upon a refusal to perform for any other reason.  . . . The *Restatement* provides:  "Generally, a party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty."  Restatement (Second) of Contracts § 250 comment d, at 274-75 (1981). See also 4 *Corbin* § 973 at 910; 11 *Williston* § 1323 at 136-38.

Noting that "the common law authorizes an action for money damages (or, in an appropriate case, for specific performance) on a contract that is breached by repudiation" the Fourth Circuit in WRH Mortg., Inc. v. S.A.S. Associates, 214 F.3d 528 (4th Cir. 2000) affirmed the judgment of the Eastern District of Virginia that the repudiation of a portion of an integrated agreement between bank and borrower for financing, construction, and lease of bank branch excused borrower's obligation to repay loan. See also Anderson Excavating & Wrecking Co. v. Sanitary Imp. Dist. No. 177, 654 N.W.2d 376 (Neb. 2002) (Contractor's letter to project owner amounted to a "repudiation" of the contract, and thus excused owner from its obligations under

34

the contract, even if parties continued to attempt to find a solution, where letter insisted on conditions not part of the contract)

In this case, the facts as alleged in the Complaint, and verified in the affidavit of Schwat, clearly establish that PNC unequivocally repudiated its obligations under the construction loan agreement by insisting on a condition - re-appraising the property - -  on which it simply had no right to insist as a condition of the extension.  Plaintiff believes that PNC's repudiation was part of a strategy of knowing violations of the loan agreement in order to bully Borrower into paying off the loan early.   Regardless of PNC's motives, it wouldn't make a difference, since a repudiation based even on a good faith belief is still a repudiation. Significantly, PNC's unequivocal repudiation of its obligations occurred on December 4, 2007, more than a month before PNC claims in its motion that it had a basis for declaring the loan in default as a result of its receipt of the Riley appraisal.

### B. Repudiation Excuses Further Performance Until And Unless Adequately Retracted, Even If The Non-Breaching Party Continues To Urge Performance.

The modern rule is that an innocent party, confronted with an anticipatory repudiation, may continue to treat the contract as operable and urge performance by the repudiating party without waiving any right to sue for that repudiation. Kammert Brothers Enterprises, Inc. v. Tanque Verde Plaza Co., 428 P.2d 678, 683-84 (Ariz. 1967); 4 *Corbin* § 981 at 938-39; 11 *Williston* § 1334 at 178-79.  The *Restatement of Contracts* explains:  "Manifestation by the injured party of a purpose to allow or to require performance by the promisor in spite of repudiation by him, does not nullify its effect as a breach or prevent it from excusing performance of conditions and from discharging the duty to render a return performance.  See also Kammert Brothers Enterprises, Inc, 428 P.2d 678; 2 Restatement (Second) of Contracts § 277 (1981), 4 *Corbin on Contracts* § 977 (1951). A repudiating party is not entitled to demand

35

performance from the innocent party or use the latter's failure to tender as a defense to the claimant. Stated another way, tender is excused where a party indicates it will not be accepted because the law does not require the nonbreaching party to do a futile or useless act. Id.

**V.    PNC'S ARGUMENT THAT CHAPIN SHOULD HAVE SOUGHT A SECOND SIX MONTH EXTENSION EVEN AFTER PNC HAD UNEQUIVOCALLY REPUDIATED ITS OBLIGATION WITH RESPECT TO THE FIRST SIX MONTH EXTENSION, AND WHILE THE PARTIES WERE ALREADY ENGAGED IN LITIGATION, IS FRIVOLOUS**

Perhaps realizing the weakness of its position with respect to the effectiveness of Chapin's first six month extension of maturity, and confronted with an inability to deny the fact that PNC had unequivocally repudiated its obligations, PNC makes the extraordinary argument that the fact that Chapin did not try to send a second six month extension notice after June 30, 2008 renders Chapin in default in any event.  By this time, PNC had already unequivocally informed Chapin, in writing, that it would reject any attempt to extend the loan, and had already filed a lawsuit against the Guarantor. There are countless authorities to the effect that the law does not require a futile act.  See Independence Management Co., Inc. v. Anderson & Summers, LLC,  874 A.2d 862 (D.C. 2005).  Does PNC actually contend that the sending of a notice of a second extension would not have been a futile act?

**VI. IF THE COURT IS NOT PREPARED TO DENY DEFENDANT'S MOTION BASED ON THIS OPPOSITION, PLAINTIFF SHOULD BE AFFORDED A REASONABLE OPPORTUNITY TO PRESENT ADDITIONAL MATERIAL AND AFFIDAVITS PERTINENT TO THE MOTION**

Rule 12(d) of the Federal Rule of Civil Procedure provides:  "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion. (emphasis supplied).

36

Defendant filed its summary judgment motion shortly after removal of this action to federal court.   Plaintiff has had only 25 days to review and respond to PNC's 42 page motion with almost 300 pages of affidavits and exhibits.  Plaintiff has not had the benefit of any discovery whatsoever, and has not even had the benefit of an Answer since Defendant chose to label their summary judgment motion as a motion to dismiss.  Defendant has even refused to provide initial disclosures under Rule 26(a)(1).

In the loan agreement, the parties clearly agreed that PNC's determinations of impairment default would be subject to both a subjective (good faith) and an objective (reasonableness) standard of review.  Clearly these dual tests were designed as a measure of protection for the Borrower against precisely the kind of arbitrary and capricious action alleged in the Complaint. It makes sense that such protections would be in a construction loan agreement such as this one, since the consequences of a bank's arbitrary declaration of default could be devastating if made in the midst of a construction project.

A determination of good faith requires an evaluation of a party's actual decision making process, actual motivations, and actual belief.  In other words, did PNC genuinely and honestly believe that the prospect of payment was impaired?  Or, was there an ulterior motive for their actions?  Even if the court finds that PNC actually believed its determination that the prospect of payment was impaired, the court must still find that PNC used a reasonable process to make that determination and that the ultimate conclusion was objectively reasonable.

Plaintiff submits that it is impossible to make such findings in a case such as this without an evidentiary hearing after a reasonable opportunity for discovery.  While we believe that the secretive and non-communicative nature of PNC's supposed determination of impairment is strong circumstantial evidence of a lack of good faith and reasonableness, much of the direct

37

evidence is obviously in the exclusive custody and control of PNC and is not available to Plaintiff except through the discovery process.  Particularly in cases where questions of motive, intent, and good faith play leading roles, courts have recognized that summary judgment should be used sparingly since proof is largely in the hands of hostile witnesses and it may be important for witnesses to be subject to cross-examination for the truth to be revealed.  Cf. National Housing Partnership v. Municipal Capital Appreciation Partners I, L.P.,  935 A.2d 300, 314 (D.C. 2007) (""Commercial reasonableness is a question of fact  "to be determined on a case-by-case basis, in light of the totality of the circumstances . . . in the context of the particular industry in which the sale took place." "Whether a sale was commercially unreasonable is, like other questions about 'reasonableness,' a fact-intensive inquiry").  See also Quality Lighting v. Benjamin, N.E.2d 377 (Ill.App. 1992) ("Even if the facts are undisputed, if a reasonable person could draw different inferences from the facts, a triable issue exists…summary judgment is particularly inappropriate where the motive, intent, or subjective feelings of the parties is at issue").

Plaintiff respectfully submits that it has presented sufficient justification in this Opposition to deny PNC's motion without the need for discovery.  However, if the Court is not prepared to so rule at this time, Plaintiff respectfully requests that it be given an opportunity to present additional material after at least a reasonable amount of time for discovery.  See Rule 12(d); see also Rule 56(f).  If the Court permits discovery, Plaintiff would expect to present to the Court:

- An affidavit from an appraiser to the effect that the Riley appraisal is so fundamentally flawed that its conclusions are inherently unreliable;

- An affidavit from an appraiser (probably a different one than the first) to the effect that a reasonable retrospective valuation of the property (i.e. as of the alleged date of default) would confirm that the value of the property was substantial higher than when the loan was made;

- An affidavit from a commercial banking expert to the effect that the bank's conduct in this case was outside of the reasonable norms of the industry, and that the Bank's position that it could declare a non-monetary default in the midst of construction, without any notice or opportunity to cure by the Borrower, is unreasonable;

- An affidavit from a commercial real estate broker familiar with the project to the effect that the project was being well received in the market, that the projected unit sales prices assumed by the Riley appraisal was unreasonably low, and that the projected time to sell was unreasonably long.

- An affidavit from a construction expert to the effect that the project could be completed well within the deadline provided by the loan agreement, and that the cost to complete may actually have been lower than expected because of cost-savings from subcontractor "buy-outs," and that the estimate of time to complete construction used by the Riley appraisal was unreasonable;

- Evidence from the bank's own files proving that the decision to repudiate the loan was made well before it received the Riley appraisal;

- Evidence from the bank's own files proving that the bank knew and approved exactly how many units and parking spaces were being constructed by Chapin;

- Evidence from the bank's own files proving that it had actual notice of the extension of maturity before ever giving notice of default;

39

- Evidence from the bank's own files proving that it knew that it had charged a huge, but erroneous, late charge;

- Evidence from the bank's own files proving that the decision to declare the loan in default was based primarily on the bank's policy decision to exit from condo construction lending in D.C. and not based on a good faith evaluation of the specifics of this loan;

- Evidence from the bank's own files that it had actual knowledge that the Riley appraisal was flawed and was in fact contradicted by its own internal valuations;

- Evidence from the bank's own files proving that it knew the project could be completed on time;

- Evidence from the Bank's own files proving that most if not all of its supposed concerns were already known to the bank at the time they released, without consideration, two of the three original guarantors of the loan;

- Evidence from the bank's own files that it actually believed that the guaranty supporting the loan was more than sufficient to ensure full payment and performance of the loan.

### CONCLUSION

PNC's motion is based on conclusory assertions that no facts are in dispute when in fact virtually every material fact is in dispute.  Contrary to Defendant's mischaracterization of Chapin as a troubled project, at the time PNC Bank repudiated its obligations and pulled the plug, Chapin was still a healthy project, being well received in the market, was scheduled to be completed on time, and was in full compliance with every single loan condition.  Defendant's secret determination of default, without any discussion with Borrower, could not possibly have

been the result of a reasonable and good faith determination of impairment.  The resolution of

this case will depend on the weighing of the evidence (and probably also the credibility of the

witnesses) with respect to highly fact-intensive questions of value, good faith and

reasonableness.  Accordingly, Plaintiff respectfully requests that Defendant's motion to dismiss

or for summary judgment be denied.

Respectfully submitted,

/s/ G. David Fensterheim

David Fensterheim, Esq., Bar # 358223
FENSTERHEIM & BEAN, P.C.
1250 Connecticut Ave., NW, Suite 700
Washington, D.C.  20036
(202) 419-1511
Fax: (202) 842-2869
david@fensterheimandbean.com
Counsel for Plaintiff

41