IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| **1443 CHAPIN STREET, LP** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-1532 |
| | ) | Judge Kollar-Kotelly |
| | ) | |
| **PNC BANK, NATIONAL ASSOCIATION** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

PLAINTIFF'S STATEMENT
OF MATERIAL FACTS AND ISSUES IN DISPUTE


Defendant, PNC Bank, National Association, by its undersigned counsel, hereby submits

this Statement of Material Facts and Issues in Dispute pursuant to LCvR 7(h) and 56.1.


**Material Facts in Dispute:**

Defendant lists 61 separate facts in its "Statement of Material facts As To Which No

Genuine Dispute Exists."  Twenty-seven of these facts (1, 2, 3, 5, 6, 8, 9, 13, 15, 16, 18, 19, 20,

21, 24, 26, 30, 32, 36, 37, 41, 42, 44, 50, 51, 56, 58) are essentially background facts such as the

names of the parties, the address of the property, the identification of the loan documents,

recitation of terms, and the amount of the loan and the advances to date, and are not in genuine

dispute.  The remaining thirty-four "facts" (4, 7, 10, 11, 12, 14, 17, 22, 23, 25, 27, 28, 29, 31, 33,

34, 35, 38, 39, 40, 43, 45, 46, 47, 48, 49, 52, 53, 54, 55, 57, 59, 60, and 61) are either in dispute

or are serious distortions of the truth.  In the interest of brevity, Plaintiff will not repeat the more

comprehensive discussion of the disputed nature of these facts contained in the body of

Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, which

discussion should be deemed incorporated herein by reference.   For purposes of this Statement,

and for the convenience of the Court, a brief description of the nature of the dispute as to these

facts, with a reproduction of the allegedly undisputed fact, follows:

*4.      PNC issued a commitment letter on December 21, 2005, which was then accepted by Chapin Street subject to minor modifications.*

    The modifications were anything but "minor."  <u>See</u> Affidavit at ¶ 17.

*7.      The borrower was required to have $1,167,000 in equity in the project.*

    There was no such requirement.  <u>See</u> Affidavit at ¶ 20.

*10.     PNC required Chapin Street's three principals to guaranty the loan. Later, for reasons not relevant to this suit, PNC agreed to release two of the guarantors, leaving only Steven Schwat liable on the guaranty.*

    The relevance of the release of the other two guarantors, for no consideration, at a time

when PNC now claims the project was troubled is obviously relevant to the credibility and good

faith of their position today.  <u>See</u> Affidavit at ¶¶ 4, 27.

*11.     The Privado was to be an 18 unit, four story condominium, including 18 parking spaces to be sold to purchasers (11 underground and 7, surface).*

    Not true.  The Commitment Letter and Construction Loan Agreement refer to a 15 unit,

not an 18 unit, project.  <u>See</u> Affidavit at ¶ 16.

*12.     The commitment letter required the loan to have a loan to value ratio that would not exceed 75%, as determined by PNC.*

    This was only a closing condition. PNC implies that it was an ongoing requirement which

is untrue.  <u>See</u> Affidavit at ¶ 22.

*14.     The commitment expressly provided that its terms and conditions would survive closing of the loan.*

PNC leaves out an important part of the provision which expressly states that terms and conditions would not survive closing if they were inconsistent with provisions in the subsequently executed loan documents. See page 8 of Commitment Letter.

*17.     The values in the appraisal satisfied PNC's requirement in the commitment that the projected gross retail sell out value not be less than $10,360,000 and that the loan to value ratio not exceed 75%.*

The Sapperstein appraisal actually calculated the as is value at $2,600,000, which results in an 80% (2,080,000/2,600,00) LTV based on the acquisition loan of $2,080,000.  Chapin does agree that this nevertheless satisfied PNC. See Sapperstein Appraisal.

*22.     The Deed of Trust Note defined Loan Agreements as the Deed of Trust Note, the Construction Loan Agreement, the Deed of Trust and "any other instrument, agreement, or document previously, simultaneously, or hereafter executed and delivered by the Borrower."*

PNC confuses the phrase "Loan Documents," with the phrase "Loan Agreements." Chapin agrees that the phrase "any other instrument . . ." constitutes a Loan Document." See Deed and Trust Note at section 7.

*23.     The definition made the commitment letter, which by its terms survived closing, a Loan Document.*

As noted previously, the terms of this document did not survive closing to the extent inconsistent with the subsequently executed agreements.  See Page 8 of Commitment Letter.

25.    *This section of the Deed of Trust and Security Agreement specified that the address for notices, requests and demands to the Bank was 8150 Leesburg Pike, Suite 310, Vienna, Virginia 22182 (the same address specified in the Construction Loan Agreement).*

Defendant neglects to mention that this notice section also specifically provided for the option of hand delivery.  <u>See</u> Section 5.03 of the Deed of Trust.  <u>See</u> Affidavit at ¶ 60.

27.    *Prominent among the events of default was the material adverse change provision that made a default a material adverse change in the financial condition of the Borrower, a material impairment of the value of the property securing the Note, or an event or condition that impairs the prospect of payment or performance of any of the obligations of the Borrower under the Loan Documents.*

Defendant incorrectly paraphrases this default provision by leaving out the express (and not merely implied) requirements that an affirmative determination must actually be made, and that that determination must be "reasonable," and in "good faith."  <u>See</u> section 9(k) of the Deed of Trust Note.

28.    *No notice or cure period is applicable to a material adverse change default.*

This is not true.  The provision does not so state and Defendant's implication is contrary to the natural reading of the clause, the parties intent and common law.  <u>See</u> Affidavit at ¶¶ 54-56.

29.    *Construction was delayed for six months because Chapin Street could not secure the permits necessary to begin.*

Defendant's use of the word, "because" implies that the delay was somehow due to the fault of the Borrower or the Project.  In fact, the delay was caused primarily by the bureaucratic reorganization, and resulting backlog, in the D.C. permitting office.  <u>See</u> Affidavit at ¶¶ 8, 23, 24.

*31.    The amount of the remaining loan proceeds were insufficient to construct the condominium and pay the interest that would be due if the two loan extensions were granted.*

There were sufficient loan proceeds to finish the project, although interest for the third year would have to be funded outside of the loan as originally intended.  <u>See</u> Affidavit at ¶¶ 7, 32, 61-62.

*33.    As of December 31, 2007, the old building had been demolished and the site cleared; excavation had been done; the foundation had been framed, but nothing more had been accomplished.*

There was much more than that done, as can be seen in the photographs attached to the Schwat affidavit.  <u>See</u> Affidavit at ¶ 62.

*34.    By its own reckoning, Chapin Street could not complete the building until September of 2008.*

It is correct that this estimate, which was clearly before the December 30, 2008 deadline, was Chapin's best estimate of completion at the time.  This does not necessarily mean, however, that it could not be completed faster, if necessary.  <u>See</u> Affidavit at ¶¶ 8, 62.

*35.    PNC's appraiser did not estimate that completion would occur before April, 2009.*

It is not clear that PNC's appraiser actually made an independent estimate of completion, and it does not appear that he is qualified to do so in any event.  The appraiser apparently used the estimated time for completion of an entire project without regard to the amount of work already completed.  <u>See</u> Riley Appraisal.

*38.    Chapin Street needed additional funding from PNC to complete the project.*

This is not true.  All that was needed from PNC was for it to live up to its original funding obligations.  <u>See</u> Affidavit at ¶¶ 7, 61.

*39.     In the fall of 2007, as the maturity date approached, Chapin Street requested additional financing from PNC and a reallocation of the remaining undisbursed loan proceeds from soft costs to a replenished interest reserve.*

This mischaracterizes the discussions.  Plaintiff does agree there were a discussions of various alternatives and options with respect to the funding of future interest.  See Affidavit at ¶¶ 32, 38.

*40.     PNC agreed to consider the refinancing request but conditioned its consideration on an updated appraisal.*

Actually, PNC repudiated its obligations at this time, not withstanding the clear language of the loan agreement, and stated that it would only consider extending the loan with a new appraisal.  PNC did also say that they would consider increasing the loan amount to cover future interest.  See Affidavit at ¶¶ 6, 38.

*43.     The new appraisal showed that the "as is" market value of the property as of January 1, 2008 was $2,430,000.*

It is not at all clear that this is what the Riley appraisal actually means.  First, the date is wrong.  It is actually January 7.  More significantly, the value mentioned in the appraisal is actually the value for a vacant parcel of ground, as can be seen from a review of page 55 of the appraisal.  See Appraisal at page 55.

*45.     The loan to value ratio was over 156%, exceeding the 75% that was required.*

This is a distortion of the facts, based on faulty assumptions of value.  Also, there was no 75% LTV requirement.  See Affidavit at 22.

46.    *The appraiser projected that the project would not be completed until April 7, 2009 and would not be sold out until April 7, 2010.*

It is not clear that PNC's appraiser actually made an independent estimate of completion, and it does not appear that he is qualified to do so in any event.  The appraiser apparently used the estimated time for completion of an entire project in the appraisal without regard to the amount of work already completed. See Riley Appraisal.

47.    *The appraiser projected that the aggregate sale proceeds of the units in the condominium as of April 7, 2010 would be $8,550,000.*

This is not true.  Actually, as indicated in the fine print, the number referred to by PNC is the "discounted sell-out value."  In other words, it is the projected aggregate proceeds, further discounted to present value using a discount rate (selected in the discretion of the appraiser) that can, and does in this case, seriously distort the actual value. See Riley Appraisal at page 4.

48.    *This compared to the $10,300,000, December 1, 2007, value in the original appraisal.*

These numbers are not "comparable" because they are based on very different assumptions and discount rates.

49.    *The new appraisal then discounted the sell out value upon completion of the condominium on April 9, 2009 and on prior to sell out on April 7, 2009 to be $7,070,000.*

This has the same distortions of value, as described above.  In addition, the use of the different dates in this context makes no sense.

52.    *On January 30, 2008, PNC issued a default notice based on the material adverse change provision in the Deed of Trust Note and advised Chapin Street that the loan would not be extended if requested by Chapin Street.*

PNC incorrectly paraphrases its default notice.  The only provision of section 9(k) relied on by PNC at the time was subsection 9(k)(iii). See Affidavit at ¶ 49.

53.    *On January 25, 2008, Chapin Street attempted to request the first extension of the loan.*

PNC's implication that this was an "attempt" is misleading.  Chapin gave proper and timely notice, confirming what PNC already knew.  See Affidavit at ¶¶ 47, 48.

54.    *At the time it made the request, Chapin Street was in default under the material adverse change provision in the Deed of Trust Note.*

Not true.  Chapin Street definitely was not in default at the time.  In fact, all payments were current, and every single loan condition had been met, as evidenced from the fact that PNC had approved all 16 prior draw requests, including one submitted a few weeks previously.  See Affidavit at ¶¶ 38, 39, 43, 51.

55.    *Chapin Street had no right under the Deed of Trust Note to extend the maturity date.*

Not true.  This was an absolute right as expressly referenced in the Commitment Letter, the Construction Loan Agreement, the Deed of Trust and the Deed of Trust Note.  See Affidavit at ¶¶ 5, 17, 18.

57.    *No request was ever delivered to the correct address.*

Not true. Chapin Street hand delivered the request to the correct address in strict compliance with the notice provisions of the agreements.  See Affidavit at ¶¶ 47-48, 60.

59.    *Chapin Street changed the plans and specifications to reduce the number of units from 18 to 16 and the number of parking spaces from 18 to 11, in violation of § 7.2 of the Construction Loan Agreement.*

Not true.  The units were actually increased from 15 to 16 with full knowledge and approval of PNC.  See also response to number 11 above.  See Affidavit at ¶ 16.

*60.      The Bank's inspector does not believe the condominium can be completed by the absolute maturity date of the loan, December 31, 2008.*

To the best of our knowledge, the bank's "inspector" never expressed any such belief. The inspector's name is Bill Allison of CMC of Alexandria. Note that there is no affidavit from Mr. Allison.

*61.      Chapin Street cannot cure the material adverse change default declared by PNC.*

Since there is no default by Chapin, there is no need for a cure.  PNC can cure its default by reinstating the loan, living up to its obligations to fund the remainder of the loan, and paying incidental and consequential damages.  If PNC had actually a genuine concern with the value of the collateral, it could easily have been addressed in a variety of ways, including by Chapin enhancing the value of the collateral by paying a portion of the construction expenses outside of the loan.

**Additional Material Facts That Must Be Resolved For A Proper Disposition Of The Merits Of This Case:**

Plaintiff incorporates by reference the discussion at section I.B of its Memorandum in Opposition to the Motion for Summary Judgment.

A brief summary of additional disputed facts and issues which must be resolved by the trier of facts follow:

1.  Whether PNC's alleged determination of impairment was "reasonable."  This is an objective standard which measures both the reasonableness of the process and well as the reasonableness of the conclusion.  See Affidavit at ¶¶ 63, 64.

2.  Whether PNC's alleged determination of impairment was in "good faith."  This is a subjective standard.  <u>See</u> Affidavit at ¶¶ 63, 64.

3.  Whether PNC application of a huge, $99,999.99, late charge was done in knowing violation of the provisions of the loan agreements.  <u>See</u> Affidavit at ¶ 57.

4.  Whether PNC decisions in this case were influenced by an overall policy decision concerning D.C. loans in general, rather than a good faith and reasonable determination of the facts relating specifically to the Chapin loan.

5.  Whether PNC was well aware of many of the facts about which it now claims it was concerned when it released, without any consideration, 2 of the 3 original guarantors of the loan.  <u>See</u> Affidavit at ¶ 4.

6.  Whether PNC insistence on an appraisal as a condition of the extension constituted a <u>knowing</u> repudiation of the agreement.  That this constitutes a "repudiation", whether knowing or not, is a legal conclusion.  <u>See</u> Affidavit at ¶ 6.

7.  Why did PNC intentionally misrepresent its knowledge of the actual receipt by PNC of the extension notice at the time it sent the January 30, 2008 default notice?

8.  Is the Riley Appraisal a reasonable opinion of value of the property as of the default date?

9.  Was PNC aware of the errors and flaws in the Riley Appraisal?

Respectfully submitted,


/s/ G. David Fensterheim

David Fensterheim, Esq., Bar # 358223
FENSTERHEIM & BEAN, P.C.
1250 Connecticut Ave., NW, Suite 700
Washington, D.C.  20036
(202) 419-1511
Fax: (202) 842-2869
david@fensterheimandbean.com
Counsel for Plaintiff