## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **1443 CHAPIN STREET, LP** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-1532 |
| ) | Judge Kollar-Kotelly |
| ) | |
| **PNC BANK, NATIONAL ASSOCIATION** ) | |
| ) | |
| Defendant. ) | |
| _____) | |

### AFFIDAVIT OF STEVEN F. SCHWAT

I, Steven F. Schwat, do solemnly declare and affirm under the penalties of

perjury, and upon personal knowledge, that the following facts are true and correct:

1.      My primary residence is at 4518 Drummond Avenue, Chevy Chase, MD

20815.

2.      I am the principal owner, through various wholly owned entities, of 1443

Chapin Street, LP, the Plaintiff herein, and the Borrower on a construction loan from

PNC Bank for a condominium construction project in Washington, D.C. (the "Project")

3.      I personally negotiated the loan terms for the financing of the Project with

the predecessor of PNC Bank, Mercantile Bank.

4.      Pursuant to a Guaranty of Performance and Payment ("the Guaranty") also

executed on or about December 30, 2005, I, along with two other individuals, Cornelius

Bruggen ("Bruggen") and Wout Coster ("Coster"), personally guaranteed the full amount

of the loan. In February 2007, PNC agreed to release Bruggen and Coster, without

consideration, from their guaranty and to accept me as the sole guarantor of the loan.

5. One of the important terms of the loan that I negotiated was that we would have a full three years before final maturity of the loan. PNC expressly agreed to this term and incorporated it into the commitment letter and the final loan documents. The loan was structured with a two year base period, and two six-month extensions. There were no conditions for the extensions other than that the loan not be in default and the payment of an extension fee. Moreover, our agreement expressly required that extensions were not discretionary with the Bank. We specifically included the word "shall" in the extension provision to make this clear. There certainly was no requirement that the loan be re-underwritten, or that the property be reappraised at the end of the base period in order to extend the loan.

6. For this reason, I was surprised and dismayed to learn, on or about December 4, 2007, from Jeff Young of PNC, that PNC would not honor my right of extension without getting a new appraisal of the property. I considered this unilateral imposition of a new condition to be a clear repudiation and breach of PNC's obligations under the agreement. At the time, however, Jeff Young gave every indication that he didn't anticipate a problem and urged me to cooperate with his appraiser. He even indicated that PNC would consider increasing the amount of the loan to cover the interest that would be due during the third year of the loan.

7. The loan included an "interest reserve" which, from the beginning, was budgeted to run out at the end of the two year base period. Jeff Young clearly knew that we had more than sufficient resources to pay the interest during the third year of the loan if PNC did not want to increase the amount of the loan. We also discussed the fact that there was even enough money in the original loan amount to pay the interest if certain

line items in our budget were reallocated.  At no time did Jeff Young express any concern to me about our ability to finish the project on time or to pay ongoing interest.

8.  Contrary to PNC's mischaracterization of the Project as "ill fated," in fact, the Project was, at least until PNC stopped funding, a healthy project that was receiving good market acceptance and which was on target to be completed on time.  Moreover, the hard construction costs were likely to be even less than budgeted since we had been successful in "buying out" various subcontractor bids at below budgeted amounts.

9.  Although concerned about PNC's repudiation of its obligations, I agreed to cooperate with PNC's appraiser and was confident that the appraisal, if done competently, would confirm that the value of the Project had increased substantially since the time the loan was first underwritten.

10.  Sometime in early January 2008, I was contacted by Al Riley, an appraiser from Riley and Associates, who indicated that he had been retained by PNC to do an appraisal of the property.  I responded to all of his requests for information as well as those of his associate, Chris Apo.  One of the questions they asked me was to estimate the total construction period for the project.  I informed him that the total construction period was approximately 12-13 months. By that time, we were already 4 months into that construction period.

11.  Since I was concerned that the appraisal be accurate, I encouraged PNC's appraiser to get back to me if he had any further questions about the project.  He promised that he would review his conclusions with me before finalizing his appraisal to ensure that he had everything right.  He never did.

12.     Until I saw the appraisal as an exhibit to the summary judgment motion, I had no further knowledge of its contents or conclusions.  I asked PNC for a copy of the appraisal many times and they always refused without any explanation.

13.     When I finally saw the Riley appraisal, I was flabbergasted.  Not only is its conclusion of value completely unreasonable, but the appraisal is so fundamentally flawed and error ridden that it is hard to believe that the mistakes were unintentional. One of the more blatant errors is the appraisal's estimate of the remaining time to complete construction as 15 months, 2 months more than the estimated time to complete the entire job!  Other basic and fundamental errors include the amount of square footage, the estimated cost to complete, and the amount of construction work already completed.

14.     Although the appraisal claims to be a "self-contained" report, which according to the standards of the appraisal industry means that the rationale for the appraiser's conclusions should be discernible within the body of the report, many of the appraiser's conclusions are incomprehensible.  He made downward adjustments for comps without any explanation. He gave no credit for properties without parking when comparing to our property with parking.  He assumed that a contractor would charge a fee based on a gross sell out, rather than the cost of the job, reflecting either sloppiness or a fundamental misunderstanding of the construction industry.  And he significantly over estimated the contractor's percentage fee as well. I could go on.

15.     It is hard to believe that PNC would not have uncovered most of these mistakes when they reviewed the appraisal.  At a minimum, one would expect that if they genuinely desired to obtain a fair valuation of the property that they would have asked me to comment on the appraisal, particularly since the appraiser's value conclusion was that

4

the property, with all of the money invested to date in constructing a new 16 unit building, was worth no more than if it were still raw land!  Yet, as noted, PNC insisted on keeping the appraisal secret until they filed their summary judgment motion.

16.    PNC in its Statement of Material Facts Not in Dispute ("PNC's Statement") claims that the loan originally required an 18 unit project and that we improperly reduced the number of units at the property from 18 to 16, and improperly reduced the number of parking spaces as well.  This is a complete fabrication.  First of all, as can clearly be seen from the commitment letter and the loan documents, the loan never required an 18 unit project, but was originally approved as a 15 unit project.  Throughout the process, we kept PNC fully informed of our efforts as we sought to maximize the value of the project.  We were actually able to increase the number of units from 15 to 16.  PNC was fully aware of and approved this.  Indeed, our records show that in October, 2006, we forwarded detailed plans to PNC for the 16 unit building, clearly showing each of the 16 units.  A copy of these plans, as forwarded to PNC in October 2006, are attached as Exhibit A to this Affidavit.  Not only did PNC approve this 16 unit plan, but they funded at least 11 additional draws after reviewing them (i.e. between October 2006 and December 2007).  Moreover, PNC would also have been provided a copy of the building permit, which is publically available document in any case.  That document also clearly shows a 16 unit building with 12 parking spaces. A copy of the permit is attached as Exhibit B.  Prior to receiving PNC's summary judgment motion, no one ever mentioned that there was a problem with the number of units or parking spaces at the Project.

5

17.     On December 20, 2005, I executed the Commitment Letter, subject to modifications contained in a letter I sent to PNC on December 21, 2005. Contrary to the characterization in PNC's Statement, these last modifications to the commitment letter were not "minor." In fact, one of the last modifications was one of the most important - - our confirmation that we would have a full three years (i.e. until December 30, 2008) to complete the Project and before the final maturity of the loan.

18.     These provisions were incorporated into the final loan documents, all of which made clear that we would have a full three years to complete construction of the project.   As noted, the extension of maturity was not optional with the Bank, but was mandatory provided the loan was not in an uncured default.  Based on all of my discussions with PNC prior to, and at the time of, the execution of the Loan Documents, it was clear that all parties clearly understood this fact and had agreed that the Chapin Street's entitlement to the two (2) consecutive six (6) month extensions was not discretionary with PNC, and also that there were no preconditions to Chapin Street's entitlement to the extensions other than that the Loan not be in default and the payment of an extension fee.  The Agreement expressly did not provide for a new appraisal or any other kind of re-underwriting at the time of the extensions.  Everyone understood that Chapin's non-discretionary right to two (2) consecutive six (6) month extensions was an important and material part of the agreement.

19.     PNC understood that Chapin Street was investing a substantial amount of equity and other resources in the Project, and that Chapin Street, myself, and the other guarantors were relying on the timely and good faith performance of the Bank with respect to its funding obligations under the Agreement.

6

20.    Contrary to PNC's Statement number 7, nothing in the loan agreement required that we maintain $1,167,000 of equity in the project.  This figure appears to come from the Bank's internal documents.  In fact, we were required only to contribute $520,000 at closing, as stated in the commitment letter.

21.    On December 30, 2005, PNC funded the first two draw requests (numbered 0 and 1) pursuant to the Agreement, for $2,080,000 and $276,064, respectively, funding the acquisition of the land, and other approved soft costs and expenses.

22.    As noted on the face of the commitment letter, after the first funding of soft costs, the loan-to value ratio for the project would be approximately 80%.  PNC's representation in PNC's Statement that there was a 75% LTV requirement in the loan documents that extended for the life of the loan is simply false.  It is true that there was a 75% loan to value requirement that was among the list of closing conditions in a section of the Commitment Letter entitled "Government Approvals/Closing Requirements, etc." That section states:  "**Prior to closing of this Loan**, the Lender will require the following to be submitted and approved . . . .e.  An appraisal, from an acceptable appraiser approved by Lender,  . . . In no event shall the loan to value exceed 75% as determined by Lender."   There is no question that this requirement was a condition of closing that was met to the satisfaction of Lender prior to closing.  There is nothing in any of the Loan Documents which would imply that this requirement somehow carried over for the life of the loan.  In fact, since the first several draws were for soft costs, this would make no sense since such a requirement would mean that the loan would be in default virtually immediately.

23.     The start of construction was delayed due to the D.C. permitting process and particularly due to the reorganization of the permitting office in D.C.  By July 2007, however, we received our final permits and were ready to begin construction, still more than enough time to complete the job by the December 30, 2008 deadline.

24.     Once started, construction of the project proceeded quite smoothly.

25.     Throughout the process, we kept PNC fully informed of Chapin Street's progress, including the delay in the expected start of construction.  Notwithstanding this delay, we knew that the Project would be completed by the required completion date of the Agreement. However, I did discuss with PNC, and PNC understood, that Chapin Street would be taking advantage of its pre-negotiated extension rights as expressly contemplated in the Agreement.

26.     From May 2006 through January 2007, Chapin Street made six (6) additional draw requests (numbered 2 through 7) in connection with the Project, totaling approximately $480,000, all of which were properly funded by PNC.

27.     On or about February 28, 2007, PNC agreed to release Bruggen and Coster from their obligations as guarantors of the Loan, leaving myself as the sole guarantor.  At that time, I executed a Reaffirmation of Guaranty of Payment and Performance.  As of this time, I already had alerted PNC, and PNC was aware, of the fact that the Project had been delayed in the D.C. permitting process. However, I am confident that PNC clearly and correctly understood that the delay would not impair its prospect of repayment of the Loan or the timely completion of the Project.

28. From March 2007 through October 2007, Chapin Street made five (5) additional draw requests (numbered 8 through12) in connection with the Project, totaling approximately $265,000, all of which were properly funded by PNC.

29. On or about October 3, 2007, Chapin Street submitted draw request number 13 for $378,626.

30. Around this time, I initiated discussions with Jeff Young and Jim Spedden of PNC with regard to the status of the Project and the impending December 31, 2007 initial maturity date of the Loan. It was clear to all parties at the time that the Loan would be extended beyond its initial maturity date. Indeed, I discussed this fact on multiple occasions during discussions and meetings between members of Chapin Street, including myself, and PNC during October 2007.

31. By email dated October 9, 2007, I advised PNC, among other things, that the Project was then expected to be complete in September 2008, still well within the required completion date provided by the Agreement.

32. During my discussions with PNC, we discussed various approaches to the additional interest charges which would be incurred by Chapin Street during the extension periods, including reallocating some of the budgeted soft costs to interest reserve, and/or PNC loaning additional funds to Chapin Street. During these discussions I made clear that I and my partners were prepared to invest additional funds to meet all future obligations, including future interest, if necessary.

33. On or about October 10, 2007, Jeff Young of PNC personally inspected the Project.

9

34.     Shortly after this inspection, Draw number 13 for $378,626 was funded by the Bank on October 12, 2007.

35.     Draw request number 14 for $54,492 was submitted on or about October 28, 2007.  This request was funded on or about October 31, 2007.

36.     Draw request number 15 for $94,389 was submitted on or about November 16, 2007.  This request was funded on or about November 21, 2007.

37.     Representatives of Chapin Street, including myself, and PNC met on December 4, 2007 to discuss the status of the Project.  At the time, I clearly expressed, and I am certain that PNC clearly understood that Chapin Street would be utilizing at least one (1), and likely both of the six (6) month extension periods provided in the Agreement.

38.     As of this date, I am certain that Chapin Street was in full compliance with all of its obligations and no one at the meeting suggested otherwise.  To my surprise and dismay, however, Jeff Young unequivocally stated that PNC would not agree to the extension without first obtaining a new appraisal.  Jeff Young presented this requirement as a non-negotiable fact, but did not suggest that he anticipated a problem.  In fact, he suggested that PNC would consider increasing its loan amount to provide the additional funding required by Chapin Street to pay the extra interest costs during the third year of the loan.  Young acknowledged that the Project was at a sensitive time in the midst of construction and advised me that he would attempt to obtain the appraisal promptly.

39.     No one from PNC gave any indication to me that they believed Chapin Street was in default of any of its obligations under the Agreement and, in fact, Jeff Young led me to believe that once the appraisal was obtained, PNC would grant the

10

extension and possibly even new financing.  Accordingly, we continued to cooperate with the Bank and its appraiser's request for information.

40.    On December 10, 2007, Jeff Young advised me by email that PNC had hired an appraiser and expected to receive the appraisal "within 45 days," (i.e. obviously past the initial maturity date).  On December 12, 2007, Young advised me, by email, that he had switched appraisers and the new appraiser expected only a 35 day turnaround, still beyond the initial maturity date.

41.    Draw request number 16 for $170,934 was submitted on or about December 14, 2007.

42.    On or about December 26, 2007, PNC funded draw request number 16 for $170,934.  This was the last draw funded by PNC with respect to the Project.

43.    I am certain that at all times, Chapin Street fully complied with each and every one of the loan conditions to be entitled to receive each and every advance it requested.

44.    Draw request number 17 was submitted on January 16, 2008. Notwithstanding that Chapin Street was in compliance with all of its obligations under the Agreement and the Loan was not in default, PNC refused to fund this advance.

45.    According to the express terms of Section 8 of the Agreement, a "default" is a specifically defined term that requires, inter alia, that the failure of performance of any covenant or agreement shall continue for at least seven (7) days after written notice of the existence of such failure is provided to Borrower.  The Agreement further provides in Section 9.2 that in the event notice is sent by certified and registered mail it shall be deemed given three (3) days after deposit in the U.S. mail.

11

46.     The first written notice that Chapin Street ever received with respect to any alleged default of its obligations under the Agreement was in a letter dated January 30, 2008. (This letter, in fact, was not actually received by me until February 22, 2008.) This letter was sent by certified mail and deposited in the U.S. mail by PNC no earlier than January 30, 2008. Accordingly, the earliest possible date that Chapin Street could be in default pursuant to this letter was February 9, 2008 (i.e. seven (7) days after written notice, plus three (3) days after depositing in the mail).

47.     Prior to any notice of default from PNC, Chapin Street had already delivered a notice of its formal exercise of the first six (6) month extension as provided under its Agreement.

48.     The notice was hand delivered to Meredith Jungen, a PNC officer with whom we had been sending virtually all of the notices and communications regarding this loan to date, including all 16 of the previous draw requests. Ms. Jungen worked in the same office as Jeff Young and the other PNC officials with whom we had dealt on this loan, all of whom had moved from the Leesburg Pike office to the Boone Boulevard location.

49.     Sometime after receiving Chapin Street's formal exercise of its extension right, PNC prepared and mailed a letter by certified mail purporting to inform Chapin Street that it was in default. Specifically, the letter alleged: "As you know the Project is significantly behind schedule and over budget. As a result, the Borrower has been and shall continue to be unable to comply with the draw conditions and timing requirements of Section 4.2 of the Agreement (regarding certifications in compliance with Section 5.3(b) of the Agreement), which constitutes a Default under the Agreement, seven (7)

12

days after the date hereof.  In addition, the Bank has made a reasonable determination, in good faith, that the condition of the project set forth above, impairs the prospect of payment and the performance of the Borrower's obligations under the Agreement, which constitutes an Event of Default under Section 9(k)(iii) of the Deed of Trust Note executed in connection with the Agreement."

50.    I had previously confirmed that PNC had already received our notice of extension and that it had been signed for by Meredith Jungen.  However, in the default letter, PNC falsely pretended that it was unaware that it had already received the extension request, stating that it understood only that Chapin Street was "considering" requesting the first of two (2) extensions provided in the Agreement.

51.    There can be no reasonable basis for PNC to have believed that the loan was in default.   I believe PNC was aware of the lack of reasonable basis for its allegations of default, and was well aware that the Project could be completed within the deadline provided in the agreement.  Shortly after receiving the default notice, we asked PNC to explain what the "event or conclusion" about which they were concerned.  They refused to do so and have not to date.

52.    PNC knew that its refusal to extend the Loan and to continue to fund construction would put Chapin Street in an extremely untenable position and they used this fact to try to bully Chapin into paying off the loan a year earlier than required.

53.    On multiple occasions, I requested copies of the Bank's appraisals and inspection reports, which purportedly formed a basis for the Bank's supposedly reasonable and good faith determinations of default.  The Bank has refused to let myself,

13

or any other representative of Chapin Street, see these reports. I had no idea what the value conclusions of the Appraisal were until we received the summary judgment motion.

54.    I understand that PNC now takes the position that section 9(k) of the Note permits it to declare an immediate default without any notice and without any opportunity to cure whatsoever.  Apparently, it is their position that they can even keep the default a secret for as long as they wish.

55.    This makes no sense.  Never in a million years would I believe that the clause could be interpreted to mean that I could be in default without knowing it.  Section 9(k) does not state that the bank can declare a default in its sole discretion, or that the default can be declared "without notice." On the contrary, the clause contains specifically negotiated protections for the Borrower to ensure that the Bank's discretion is limited by "good faith" and by "reasonableness."  It is simply impossible for a Bank to make a good faith and reasonable determination to declare a default in the midst of a construction project, particularly one with a personal guaranty for the full amount of the loan, without atleast discussing its concerns with the Borrower and giving the Borrower a reasonable opportunity to address those concerns.

56.    I understood that PNC's agreement to be governed by standards of good faith and reasonableness meant, at a minimum, that I would be given a reasonable and fair opportunity to address any concern before being declared in default.  These protections were very important to me when I signed the loan documents since I was embarking on a major construction project and an arbitrary determination of default in the midst of construction could obviously be devastating.

14

57.     My perception that I was being strong-armed into paying off the loan early was, unfortunately, buttressed by PNC's next shocking action.  When we received our first invoice after the default notice, it contained a huge late charge of $99,999.99! Thinking this must be some kind of computer error, I contacted PNC and informed them that this charge was clearly erroneous and unauthorized by any of the Loan Documents. To my surprise, PNC did not deny that the charge was improper, but it refused to remove it from Chapin's account.

58.      In an attempt to mitigate the damages caused by PNC's breach, I initially attempted to continue to fund construction "out of pocket" by utilizing funds I, and other members of Chapin Street advanced while I sought to persuade PNC to live up to its obligations.  During this period, Chapin Street partners advanced another $590,000, which was directly invested into the Project.  I also obtained commitments from our partners for at least an additional $525,000.  However, once it became clear that PNC had no intention of honoring its funding obligations, I had no choice but to halt construction and to bring this action for specific performance and/or damages.

59.     In the short time we have had for preparation of Chapin's Opposition to PNC's Motion for Summary Judgment, I have spoken with several individuals with expertise in real estate valuation and commercial lending. If we had the time, I am confident based on these preliminary discussions that we could obtain, within 60 days, the following:.

- An affidavit from a commercial banking expert to the effect that the bank's conduct in this case was outside of reasonable norms of the industry, and that the Bank's position that it could declare a secret non-monetary default in the

15

midst of construction without any notice or opportunity to cure by the Borrower is unreasonable;

- An affidavit from an appraiser to the effect that the Riley appraisal is so fundamentally flawed that its conclusions are inherently unreliable;

- An affidavit from an appraiser to the effect that a reasonable retrospective valuation of the property (i.e. as of the alleged date of default) would confirm that the value of the property was substantial higher than when the loan was made;

- An affidavit from a commercial real estate broker familiar with the project to the effect that the project was being well received in the market and that the projected sales price assumed by the Riley appraisal was unreasonably low, and that the projected time to sell was unreasonably long.

- An affidavit from a construction expert to the effect that the project could be completed well within the deadline provided by the loan agreement, and that the cost to complete was well within budget, if not lower due to anticipated cost savings, and that the estimate of time to complete construction used by the Riley appraisal was patently unreasonable;

60.    Contrary to implications of PNC's Statement Numbers 24-25, the notice that we personally delivered to PNC was done in strict compliance with the terms of the loan documents.  This loan was originally made with Mercantile, a bank that was subsequently acquired by PNC.  The administrative offices for Mercantile were in offices on the third floor of a building above one of its branches, in Suite 310.  However, after the loan closed, PNC acquired Mercantile and moved all of these administrative offices to

16

Boone Boulevard. As noted above, the loan officers involved in Chapin's loan informed Chapin of this move and instructed Chapin to send all future communication to them at the new address. Thereafter, all communications from PNC contained this new address. The old third floor location of the Mercantile administrative offices were closed shortly thereafter and the space is now occupied by a unrelated party. The only thing left at the address is the bank branch downstairs. Attached as Exhibit C is a copy of the business card which Jeff Young gave me when he advised me of the new address to use for all future communications. Prior to receiving PNC's motion for summary judgment, no one had ever suggested that our notice was sent to the wrong address.

61. PNC's Statement number 38, that Chapin needed additional funding from PNC to complete the project is false. We had more than enough funds on hand to complete the project so long as PNC lived up to its funding obligations.

62. Contrary to the implications of PNC's Statement that the Project was behind schedule and that little had been done by the time of PNC's declaration of default, in fact, by that time, we were about a third of the way toward completion of the entire project. The entire site had been fully excavated, the garage floor walls and walls had been poured, the utilities and site work was complete with the water main connected to the building as well as the gas line sleeves and the storm water drains and holding tanks and sand filters, the elevated slab, which is the floor to the cellar units had been poured, and the concrete work was 95% complete. The remaining work to be completed by that time was the framing, the utilities and finishes. Attached as Exhibit D are photographs which give some indication of the extensive amount of work that had already been done by this time.

17

63.    I do not believe PNC could possibly have made either a good faith or a reasonable determination that their prospect of payment or performance had been impaired.  On multiple occasions, even after sending the default letter, PNC officials expressed the belief that because of my guaranty they still expected to be fully repaid every penny of the loan, even including interest, penalties, late charges and attorney's fees.

64.    Together with my staff, we have dozens of years of experience in the construction loan industry in the D.C. area.  I have even done several similar projects with PNC's predecessor, Community Bank of Northern Virginia.  Nothing has prepared me for PNC's extraordinarily unreasonable conduct in this case. Their actions in this case:  repudiating clear obligations, distorting clear language of our written agreements, charging ridiculously high and unauthorized late charges and generally trying to bully us into paying off our loan earlier than we had bargained, were beyond anything either I or anyone on my staff have ever experienced. Above all, PNC's interpretation of the "reasonable" and "good faith" standards of the default provision, that it permits them to declare an immediate and secret default as a basis for cutting off funding in the midst of construction project, without so much as discussing their concerns with me, are in my opinion, completely out of the norm.

Steven F. Schwat

## DECLARATION

I declare under the penalties of perjury that the foregoing is true and correct.

Executed on October 3, 2008.

Steven E. Schwat

19